2016 IL App (1st) 131959

FIFTH DIVISION
April 29, 2016

No. 1-13-1959

|  |  |  |
|---|---|---|
|  | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
|  | ) | Cook County |
| Plaintiff-Appellee, | ) |  |
|  | ) |  |
| v. | ) | No. 10 CR 16871-01 |
|  | ) |  |
| RICARDO ARZE, | ) |  |
|  | ) | Honorable |
| Defendant-Appellant. | ) | Noreen Valeria Love, |
|  | ) | Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Gordon and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Cook County, defendant Ricardo Arze was found guilty of two counts of criminal sexual assault (720 ILCS 5/12-13(a)(1), (2) (West 2004))[1] and sentenced to 13 years in the Illinois Department of Corrections. On appeal, defendant argues the trial court erred in: (1) granting the State's motion to reconsider and reinstating the verdict, after admitting other-crimes evidence; (2) failing to admit subpoenaed medical records or publish certain medical records to the jury; (3) precluding or limiting the examination of witnesses; and

---

[1] Sections 12-13(a)(1) and 12-13(a)(2) were renumbered on July 11, 2011. Pub. Act 96-1551, §5 (eff. July 1, 2011) (amending 720 ILCS 5/12-13(a)(1), (2) (West 2010)) (now codified as 720 ILCS 5/11-1.20(a)(1), (2) (West 2012)). The renumbering does not affect the arguments nor the judgment in the instant case.

(4) imposing an improper sentence based in part on limiting the cross-examination of a witness.

For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3      On September 11, 2008, defendant was indicted on two counts of criminal sexual assault

(*id*.) and one count of unlawful restraint (720 ILCS 5/10-3 (West 2004)) for the March 24, 2005,

sexual assault of a woman named M.S., who was a patient of defendant.[2]  The State subsequently

elected to proceed to trial on the two counts alleging criminal sexual assault.

¶ 4                                  A. Pretrial Proceedings

¶ 5      On December 16, 2008, the State filed a motion to admit evidence of other crimes during

defendant's trial, pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code)

(725 ILCS 5/115-7.3 (West 2008)).  The State asserted defendant's sexual conduct or sexual

assaults of four women other than the complainant should be considered relevant on the issues of

defendant's identity, intent, motive, common scheme or design, lack of consent, *modus operandi*,

and propensity.  Specifically, the State sought to admit testimony from N.R., B.S., Y.G., and

R.V.,[3] four of defendant's former female patients who claimed defendant engaged in

nonconsensual sexual conduct with them in his examination room during the time period from

2005 through 2007.  The State noted defendant had been the family physician of the

complainant, M.S., from 1999 through 2002, and was accused of forcibly having sexual

intercourse with M.S. in 2005, while administering treatment for "the flu."[4]  The State further

argued defendant's alleged misconduct with his other patients was similar to and proximate in

time to the charged offense and would also rebut a potential defense of consent.

---

[2] We will use the victim's initials to protect her privacy.
[3] We will use the initials of the four women to protect their privacy.
[4] We note that the State's motion to admit evidence of other crimes indicates M.S. was treated for "the flu," while M.S.'s testimony indicates that she was treated for pneumonia.

¶ 6     Defendant apparently filed a response to the motion,[5] arguing that: (1) the other-crimes evidence must fall within a common law exception before it may be introduced as evidence of propensity to commit sexual assault; (2) none of the common law exceptions for admitting other-crimes evidence applied to this case; (3) the alleged other misconduct was not similar to or proximate in time to the charged offense; and (4) admission of the other cases of alleged misconduct would result in mini-trials which would become the focal point of the proceedings against defendant.

¶ 7     On August 16, 2010, the trial court entered an order granting the State's motion. Although the order is not included in the record on appeal, the parties agree the record otherwise indicates the trial court ruled the evidence was admissible on the issues of intent, lack of innocent frame of mind, and propensity. The court denied the admission of the evidence for the purpose of establishing *modus operandi*.

¶ 8     On September 24, 2010, defendant filed a motion seeking discovery in part of the names of all treating physicians of M.S., N.R., B.S., Y.G., and R.V., including psychologists and psychiatrists. Defendant also sought records concerning medical, psychological, and neuropsychological examinations of these witnesses. On December 21, 2010, the State filed a response objecting to these discovery requests, arguing the mental health records were privileged by statute (see 740 ILCS 110/10 (West 2010)). On June 30, 2011, defendant filed a reply in support of the motion for discovery, arguing the records at issue were discoverable even if they were privileged, and requesting the trial court to order production of the records for an *in camera* inspection.

¶ 9     On July 12, 2011, the trial court granted defendant's motion for disclosure of the medical

---

[5] A copy of defendant's response included in the record on appeal bears no time-stamp indicating the motion was filed, but the State's brief represents that the motion was filed.

records, subject to an *in camera* inspection. On September 6, 2011, the State filed a supplemental answer to discovery, tendering records the State received relating to N.R., B.S., Y.G., and R.V., to the trial court for *in camera* review. The State also answered it was awaiting the receipt of records relating to these individuals from other certain medical providers. On December 21, 2011, the trial court issued a series of orders to additional medical providers directing them to provide records relating to M.S. for *in camera* review. On May 1, 2012, the trial court entered an order directing that "the medical records previously reviewed *in camera* shall be included in the record in [*sic*] as sealed documents *instanter*."

¶ 10                                    B. Trial

¶ 11                              1. M.S.'s Testimony

¶ 12     At trial, M.S., the complainant, testified through an interpreter that she was currently 55 years old. Defendant had been her mother's physician before her mother's death in 2002. M.S. was first examined by defendant at the end of 2001, in part because defendant spoke Spanish. At that time, she informed defendant she felt depressed, felt pressure from her two jobs, and was not feeling well. Defendant prescribed her medicine for depression, which made her feel "[n]ot too much" better. Thereafter, M.S. met with defendant when she took her mother to him for treatment.

¶ 13     Thereafter, M.S. was examined by defendant on March 15, 2005, when she had contracted pneumonia. Defendant diagnosed M.S., prescribed medication, provided a note for M.S. to give to her employer, and directed her to return for a follow-up examination. When M.S. returned to defendant's office on March 21, 2005, she was feeling better. Defendant requested that M.S. return for another follow-up appointment.

¶ 14     On March 24, 2005, M.S. returned to defendant's office. During the appointment,

defendant directed her to sit on the examination table, and to remove her blouse and sweater. M.S. remained in her brassiere, thinking defendant was going to examine her lungs. Defendant then grabbed his penis and touched "everywhere" on her body. M.S. wanted to scream, but defendant "would tell [her] not to do anything, to be quiet" and reminded her there were many people outside.

¶ 15    Defendant moved M.S.'s body toward the front of the examination table. M.S. testified her jogging pants were pulled down, but she did not recall whether defendant pulled them down. When defendant was next to M.S., she could observe defendant's penis was "big [and] fat." According to M.S., defendant pulled her legs apart while informing her she "was going to like it." Defendant inserted his penis into her vagina while standing in front of her. M.S. did not recall whether defendant ejaculated, but he gave her something with which to clean herself. Defendant then provided M.S. a note to give to her employer.

¶ 16    M.S. "didn't feel right" and "just wanted to leave" defendant's office. She paid her bill, cried for an hour in her automobile, and returned home. M.S. did not notify anyone at defendant's office because there were many people there including defendant's wife, and she thought no one would believe her. She did not inform her husband or son because she believed they would have murdered defendant and would have been incarcerated. She did not inform her sister because she and her brother-in-law were defendant's patients and believed in defendant. She never returned to defendant's office.

¶ 17    M.S. received a telephone call from her sister in September 2007, and learned that someone had filed a complaint against defendant. When M.S. returned home from work that day, she observed defendant on a news broadcast. M.S. then informed her sister and her husband of the 2005 incident. M.S. and her husband proceeded to the police station in Berwyn, Illinois.

M.S. informed the police regarding the 2005 incident and thereafter identified defendant in a police lineup.

¶ 18     On cross-examination, M.S. acknowledged it was not uncommon for defendant's employees to enter the examination room during an appointment.  M.S. further testified during cross-examination that defendant pulled down her pants.  She acknowledged her sister visited defendant 10 times after the incident, but she did not inform her sister of the incident.  M.S. further testified this was the "fifth different story" she had provided about the alleged assault. The trial judge sustained the State's objection to the cross-examination of M.S. on whether she had lied to the State about visiting other doctors in the United States after the incident.

¶ 19                              2. N.R.'s Testimony

¶ 20     N.R. testified through an interpreter that she was 46 years old at the time of the trial.  She testified that in 2006 and 2007, she lived in Cicero, Illinois, with her sons and her then-husband. N.R. further testified she stopped seeing her previous doctor because he tried to kiss her during her last appointment.  At this juncture in N.R.'s testimony, the jury was instructed by the trial judge that N.R.'s testimony was being presented on the issues of defendant's intent, lack of innocent frame of mind, and propensity.  During her initial visit on September 5, 2006, N.R. informed defendant of her depression and her problems with her then-husband including an unspecified traumatic sexual event.  Defendant prescribed medication to assist N.R. to relax and sleep.

¶ 21     Approximately one month later, N.R. returned to defendant's office because she needed more medication.  During the examination, defendant asked N.R. about her sex life.  N.R. communicated to defendant she did not want to discuss her sex life, but defendant responded that talking about sex was part of the treatment for her depression.  Defendant, who was behind N.R.,

put all 10 of his fingers on her neck and moved them up and down, and asked her what she was feeling. N.R. communicated to defendant not to touch her because she was not feeling anything. Defendant blew into her ear, which made N.R. "feel bad." She asked defendant to stop blowing in her ear, but he insisted she had to feel something. Defendant, however, ultimately "gave [her] the medication" for her depression.

¶ 22    N.R. returned to defendant's office approximately two months later because the medication she received was helping her symptoms. During the examination, defendant again inquired about N.R.'s sex life. N.R. testified that at some point during these conversations, defendant informed her she could buy "toys" to satisfy herself.

¶ 23    N.R. further testified that her final visit to defendant's office occurred in 2007, and was a scheduled appointment for a Pap smear. When N.R. arrived, she was informed that a mammogram would be performed. N.R. was initially lying prone and clothed on the examination table. Defendant opened N.R.'s pants and commenced feeling her lower abdomen. Defendant then reminded her of the mammogram, unhooked her brassiere, and began touching and rubbing her breasts with both hands in a circular motion. After approximately two minutes, N.R. inquired whether defendant was going to perform the mammogram, to which defendant responded that he would refer her to a hospital for the mammogram. N.R. requested that defendant stop touching her, but defendant did not stop. Defendant was breathing heavily and N.R. observed an erection through his pants. There was a knock at the door. N.R. heard a female voice. Defendant opened the door slightly, looking sideways and keeping his lower body behind the door. After defendant spoke to the individual, he closed the door and instructed N.R. "to go with the girl." N.R. testified that defendant also inquired about her sex life during this incident.

¶ 24    After the final incident, N.R. did not report what occurred to the police, but did speak to one of defendant's employees and one of her sons about the incident.  N.R. testified she was examined by defendant on one other occasion and he "act[ed] in a professional manner" toward her.  N.R. traveled to Texas and while there received a telephone call from her son.  N.R. returned to Illinois approximately three days after the telephone call and went to a police station in Berwyn and spoke with a police officer.  N.R. was accompanied to the police station by a coworker who acted as a translator.  Prior to her testimony, N.R. did not know M.S. or B.S.

¶ 25    On cross-examination, N.R. recalled that during her second examination, defendant put his hands down to her buttocks.  N.R. acknowledged that, unlike her experience with her prior physician, she continued to seek treatment from defendant despite defendant's behavior.  N.R. could not recall whether she informed the State regarding the final incident which involved an appointment for a Pap smear.  When cross-examined about what she informed the State regarding these events, N.R. testified she did not speak much English, but understood the language fairly well.  N.R. did not recall whether she related to the Berwyn police officer that she had observed defendant with an erection through his pants.  N.R. had not informed either the police officer or the prosecutors that defendant reached down to her vaginal area during her final visit.

¶ 26                                3. B.S.'s Testimony

¶ 27    The trial judge instructed the jury that B.S.'s testimony was being presented on the issues of defendant's intent, lack of innocent frame of mind, and propensity.  B.S., who was 53 years old at the time of the trial, testified that in 2004, she was having trouble in her marriage and her cousin recommended she consult with defendant.  B.S. first visited defendant on October 12, 2004, and she informed defendant her husband had been unfaithful.  Defendant diagnosed B.S.

with depression and prescribed medication. Defendant proceeded to see defendant on multiple occasions in 2005, 2006, and 2007, not only for treatment of her depression, but also for breast surgery.

¶ 28    B.S. further testified defendant made her uncomfortable in the examination room. On the first such occasion, defendant lowered her gown, hugged her, whispered in her ear and licked her neck. Defendant informed her he was attempting to make her feel something, or desire sex. B.S. pushed defendant away from her. According to B.S., similar incidents occurred on five or six occasions during her appointments with defendant. B.S. further testified that on one occasion, defendant bit her breasts, which caused her to scream.

¶ 29    During her final appointment, defendant informed B.S. he was "trying to find her weak side" and put his finger in her vagina. B.S. pushed defendant away and he left the examination room "bothered." B.S. did not return to defendant's office thereafter, realizing his behavior was not therapy. After observing defendant on television, B.S. telephoned her cousin who originally referred her to defendant. B.S. then proceeded to a police station and reported what had occurred during her appointments with defendant. B.S. did not know M.S. or N.R.

¶ 30    On cross-examination, B.S. acknowledged knowing that defendant's wife worked at his office, but did not recall telling the State that the wife was present during one of the sexual assaults. B.S. did not recall defendant recommending a mammogram or a biopsy, but did remember traveling to Mexico for a cosmetic procedure. She also did not recall having a Pap smear during her final appointment with defendant.

¶ 31    B.S. further acknowledged she met with an attorney to discuss filing a civil lawsuit against defendant, but she testified she did not file the suit. During a sidebar, the trial judge ruled that B.S. could be cross-examined on whether she was aware of a lawsuit filed two years

after the final incident, but that defense counsel could not impeach B.S. with a document she had not signed and of which she might not be aware. Following the sidebar, B.S. testified she did not remember an attorney named Richard Nielsen nor recall authorizing him to correspond with defendant. B.S. was unaware that a lawsuit against defendant was filed on her behalf and subsequently dismissed.

¶ 32                                    4. Detective Roger Montoro's Testimony

¶ 33     Roger Montoro (Detective Montoro) testified that he was a Berwyn police detective when he met with M.S. on September 26, 2007. M.S. appeared upset when she arrived at the police station. Although Detective Montoro spoke little Spanish and M.S. spoke in broken English, the two conversed about her report that defendant assaulted her. Detective Montoro reported the assault which occurred on March 21, 2005, but he did not cross-reference M.S.'s medical records. After several minutes of conversation, M.S. indicated she would prefer to speak to a female officer. Detective Montoro complied with the request and asked officer Leilani Cappetta (Officer Cappetta) to speak with M.S. On September 26, 2007, Detective Montoro brought defendant into police custody.[6]

¶ 34                                    5. Dr. Jeffrey Tiemstra's Testimony

¶ 35     Dr. Jeffrey Tiemstra (Dr. Tiemstra), a licensed physician, testified for the State as an expert in the field of family medicine. Dr. Tiemstra testified he reviewed the medical records and the police report related to M.S. When defendant treated M.S. for pneumonia, tests for human immunodeficiency virus (HIV) and syphilis were ordered. Dr. Tiemstra could see no basis in the file for a HIV test. Dr. Tiemstra further testified that in 2005, Illinois law required a patient to sign an informed consent form before a HIV test could be administered, which he did

---

[6] The trial transcript indicates Detective Montoro may have also spoken with N.R. and B.S. on different occasions, but he only testified about his conversation with M.S. at trial.

not find in M.S.'s chart. The results of the HIV and syphilis tests, conducted on March 22, 2005, were negative. Dr. Tiemstra opined the medical records did not suggest a need for a gynecological or breast examination. Dr. Tiemstra also opined sexual contact between a physician and a patient is considered "completely unethical" and not consistent with reasonable medical standards.

¶ 36     On cross-examination, Dr. Tiemstra acknowledged he did not interview M.S., did not determine whether she was credible, and had no personal knowledge of whether defendant assaulted her. Dr. Tiemstra further acknowledged the medical records did not indicate that defendant performed a pelvic or breast exam in year 2005. Dr. Tiemstra also acknowledged that patients with advanced acquired immunodeficiency syndrome (AIDS) are at increased risk of pneumonia, but he testified that those individuals would usually have been infected with HIV for many years and have many other symptoms, such as a low white blood cell count. Dr. Tiemstra opined there was a strong indication that M.S. did not have AIDS because the charts he reviewed revealed M.S. had a normal and complete blood count. M.S.'s other symptoms also did not raise a strong possibility of AIDS.

¶ 37                    6. Stipulation of Debra Arze's Testimony

¶ 38     In the presence of the jury, the parties stipulated that Debra Arze (Debra), defendant's wife, would testify that she was the manager of defendant's offices from 1994 through September 2007. Debra would further testify that defendant was the only physician to treat M.S. during the time periods relevant to this case.

¶ 39                    7. Motion for a Directed Verdict

¶ 40     The State rested its case and outside the presence of the jury, defense counsel moved for a directed verdict. The trial judge denied the motion. Defense counsel further moved for a

mistrial based on the other-crimes evidence. The trial court denied the motion.

¶ 41                              8. Officer Cappetta's Testimony

¶ 42    Officer Cappetta testified for the defense that in September 2007, she was a Berwyn police sergeant. On September 29, 2007, Officer Cappetta worked with Detective Montoro and spoke with B.S. about her report of being sexually assaulted by her physician.[7] B.S. indicated defendant engaged in inappropriate conduct on more than one occasion, but B.S. continued to visit defendant to receive her medication. B.S. visited defendant on three more occasions after defendant inserted his finger in her vagina.

¶ 43                              9. Other Patients' Testimonies

¶ 44    Yolanda Pantoja (Yolanda), Alfredo Pantoja (Alfredo), and Maria Guerra (Maria) testified they were patients of defendant's during the time period from 1994 through 2005. Yolanda testified that on March 24, 2005, she and Alfredo were present in the office and she did not hear any raised voices or defendant telling anyone to be quiet. Yolanda did not overhear any patient conversations on that date. Alfredo was unsure whether he visited defendant's office in March 2005. He did recall, however, that he generally could not overhear what was occurring in the examination rooms, particularly because defendant's office was very busy. Alfredo further testified that other people did not enter the examination room when he was examined by defendant. Maria testified she could hear what occurred in other examination rooms and that defendant's staff would occasionally enter the room during examinations, including when a Pap smear was being performed.

¶ 45                              10. Jaqueline Poggi's Testimony

¶ 46    Jaqueline Poggi (Jaqueline), a licensed phlebotomist and defendant's half-sister, testified

---

[7] Although the State's brief represents that Cappetta interviewed M.S. on September 29, 2007, the record indicates Cappetta interviewed B.S. – not M.S. – on that date.

she assisted defendant by taking blood from patients. Jaqueline testified she was working at defendant's office on March 21, 2005. Jaqueline's recollection was refreshed by office records. She recalled taking blood samples from M.S. for HIV and syphilis tests on that date. Jaqueline further testified her two daughters had also worked at defendant's office, as had defendant's wife, who worked at the office "all the time."

¶ 47                                11. Dr. Christina Arellano's Testimony

¶ 48    Dr. Christina Arellano (Dr. Arellano), a licensed physician, testified she was a patient of defendant in 1998 and worked in his office in various capacities from 1999 through 2007. According to Dr. Arellano, defendant had an extremely high-volume practice, treating anywhere from 40 to 60 patients on a daily basis. Defendant was able to see such a high volume of patients in part by having Dr. Arellano interview patients before defendant examined them. Dr. Arellano could hear what transpired in the examination rooms, the receptionist area, and the hallway when she was in the other examination rooms because the office space was compact and had thin walls. Staff could potentially walk into the examination rooms during examinations, as the doors were not locked. Dr. Arellano never heard any complaints from patients that defendant had behaved inappropriately. Dr. Arellano further testified that while she worked in defendant's office, defendant always behaved in a manner that was extremely professional.

¶ 49    On cross-examination, Dr. Arellano acknowledged she could hear conversations in the other examination rooms, but "it was more of a mumbling at times." Defendant's patients consisted of more women than men. Dr. Arellano further testified defendant treated as many as 15 patients on a daily basis for major depressive disorder. Dr. Arellano would always ask such patients about their sexual histories because sexual dysfunction was pertinent information pertaining to the patients' depressions. Dr. Arellano also acknowledged that, in order to protect

the privacy of the patients during examinations, defendant's staff would knock on the door of an examination room and upon receiving permission would enter the room. In addition, flags would be placed outside examination rooms to indicate when a gynecological exam was underway.

¶ 50                    12. Debra's Testimony

¶ 51    Debra, defendant's wife since 1984, testified she acted as defendant's office manager in 2005. On March 24, 2005, M.S. signed in as the ninth patient, while the Pantojas signed in as the tenth and eleventh patients. Debra testified that M.S. would have been assigned to an examination room with a large antique bed which was so large it would not recline and required patients to sit. M.S. was provided two notes on March 24, 2005: one was a referral to a vascular surgeon and the other was for M.S.'s employer. Debra further testified that she may have occasionally entered an examination room without knocking, but generally knocked and waited for defendant's response.

¶ 52    On cross-examination, Debra acknowledged that office records for March 24, 2005, indicated M.S. had a 6:45 a.m. appointment, while the Pantojas were in fact scheduled for 12:25 p.m. that day. Debra also acknowledged the office records did not indicate the examination room to which M.S. was assigned. Debra further acknowledged the bed in the examination room she had described could be laid flat, but was generally kept upright due to space considerations. Debra agreed that 17-year-old Silvana Poggi (Silvana) took M.S.'s medical history on March 24, 2005, but Debra never observed Silvana enter that examination room. Debra agreed there were no office records indicating Silvana worked at defendant's office on the date in question. Further, Debra acknowledged she did not enter the examination room occupied by M.S. on March 24, 2005. In addition, Debra testified M.S.'s consent form for an HIV test was not in M.S.'s medical records, but was retained in a binder kept by the office. Debra maintained she did

not have access to the binder because the police seized defendant's records.

¶ 53                                    13. Jury Instruction Conference

¶ 54    During the trial, a jury instruction conference was held outside the presence of the jury. Defense counsel raised his ongoing objection to the other-crimes instruction, noting it had already been read twice to the jury. The trial court ruled the other-crimes instruction would be given to the jury.

¶ 55                                    14. Silvana's Testimony

¶ 56    When testimony resumed, Silvana testified defendant was her uncle. In 2005, she was a college student and volunteered in defendant's office, interviewing patients and filing paperwork. Silvana testified she would be present "all the time" when defendant conducted examinations.

¶ 57    Silvana remembered M.S. because her mother had an interesting medical condition. Silvana was present for the March 24, 2005, examination and defendant never instructed M.S. to disrobe nor did he behave inappropriately. No one sexually assaulted M.S. in Silvana's presence.

¶ 58    On cross-examination, Silvana acknowledged defendant paid for part of her college expenses. Silvana also conceded that in 2007, after learning of the complaint by M.S., she did not contact the Berwyn police to inform them she had been present and that no sexual assault occurred on the date in question. Silvana further acknowledged her initials did not appear on M.S.'s chart for March 21 or 24, 2005, although the chart for the latter date included initials belonging to her younger sister Marianna, Anna Larious, and Debra. Silvana agreed she did not see M.S. on March 14 or 17, 2005.

¶ 59                                    15. Defendant's Testimony

¶ 60    Defendant testified on his own behalf regarding his treatment of M.S., B.S., and N.R. Defendant denied engaging in the sexual behavior to which his patients testified.

¶ 61    On cross-examination, defendant acknowledged he questioned N.R. about her libido, explaining that a lack of libido may be a physical symptom of depression. Defendant further testified he might treat libido as a symptom of depression by recommending exercise, or prescribing medication, as he did in N.R.'s case. Defendant acknowledged he gave N.R. a Pap smear, but he testified he always had an assistant, and occasionally a student, resident, or trainee to assist him with the procedure. Defendant later conceded he was often alone in the examination room with patients for a few minutes when the assistant would have to retrieve equipment or forms. Further, earlier in his career, there were occasions where he would speak alone with patients about sensitive social, economic, or family questions. Defendant further testified he hugged or clasped the hands of a patient many times when the patient was distressed. On redirect examination, defendant testified an assistant performed the Pap smear of N.R. on September 20, 2007.

¶ 62                        16. Parties' Stipulations

¶ 63    The parties further stipulated that Detective Montoro, if recalled as a witness, would testify that N.R. informed him she complained about defendant's conduct three times to a female doctor at defendant's office. If Lizette Rivera (Rivera)[8] was called as a witness, she would testify that she interviewed M.S. on September 30, 2007, and that M.S. did not recall whether the incident occurred on her first visit to defendant's office or on a follow-up visit. Rivera would further testify that M.S. had stated defendant requested her to disrobe but M.S. did not indicate that defendant pulled down her pants or underwear. The parties further stipulated that if called as a witness, Annette Milleville would testify that on September 9, 2008, she was an assistant State's Attorney and was informed by B.S. in a telephone interview that Debra was outside the

---

[8] Rivera is not identified by title in the record.

examination room door during one of her appointments.

¶ 64     Outside the presence of the jury, defense counsel renewed the motion for a directed

verdict, which the trial judge again denied.

¶ 65                                    17. The Verdict

¶ 66     During an exhibits conference, the trial judge ruled the medical records used during trial

would not be provided to the jury because the records were confidential.  Following closing

arguments and jury instructions, the jury retired to deliberate.  At the conclusion of its

deliberations, the jury found defendant guilty on both counts of criminal sexual assault.  The trial

judge entered a judgment on the verdict.

¶ 67                                 C. Posttrial Proceedings

¶ 68     On June 4, 2012, defendant filed a posttrial motion for a new trial or judgment

notwithstanding the verdict.  Defendant argued the trial judge erred in admitting the other-crimes

evidence and also erred in denying the defense motion for a mistrial on that basis.  Defendant

further argued the trial judge erred in failing to provide the defense with the medical records that

were sealed and made part of the trial record.  Defendant also argued the trial judge erred by

limiting cross-examination of M.S. regarding her comments to prosecutors during pretrial

discovery, and of B.S. regarding the lawsuit ostensibly filed on her behalf.  On August 1, 2012,

defendant filed an amended supplemental posttrial motion elaborating on the arguments

regarding the medical records and the civil lawsuit, additionally asserting that the medical

records used at trial should have been provided to the jury.

¶ 69     On August 20, 2012, following a hearing on the matter, the trial judge rejected

defendant's argument regarding the refusal to provide the medical records to the jury, observing

that the records contained coding that would have been confusing to the jury.  The trial judge

also ruled the sealed medical records were not relevant to the trial. The trial judge further ruled, however, that she had erred in admitting the other-crimes evidence, finding the other incidents as testified to at trial were not sufficiently similar to the incident involving M.S. Accordingly, the trial judge granted defendant's motion for a new trial.

¶ 70     On September 17, 2012, the State filed a motion for reconsideration of the trial judge's decision to grant a new trial. Noting that the State had not sought to admit the other-crimes evidence under the more stringent standards of similarity for proving *modus operandi*, the State argued the other-crimes evidence was admissible because in each case, defendant created a relationship of trust, inquired about their family issues and sex lives, identified vulnerable women suffering from depression, and isolated them in examination rooms. On October 25, 2012, the trial judge conducted a hearing on the motion to reconsider and took the matter under advisement to review the testimony and case law.

¶ 71     On November 5, 2012, the trial court granted the State's motion for reconsideration and denied defendant's motion for a new trial. The trial judge observed that the women at issue were in the same age range and all had been diagnosed with depression, although the other crimes occurred during other types of treatments. Each incident occurred when the women were partially undressed. Two of the women testified to observing defendant's erection during the incidents. In each case, defendant touched the vaginal area. The women each had said "no" or otherwise indicated the behavior was inappropriate. The incidents also occurred when defendant was in close proximity to the women on an examination table. The trial judge thus re-entered a judgment on the verdict on both counts.

¶ 72     On December 3, 2012, defendant filed a motion for reconsideration of the trial judge's denial of his motion for a new trial. On February 7, 2013, following a hearing on the matter, the

trial judge denied defendant's motion for reconsideration.

¶ 73                                      D. Sentencing

¶ 74    On April 15, 2013, the trial court conducted a sentencing hearing.  In aggravation of the offense, the State called L.H., a woman who visited defendant in 1992 for her first Pap smear at age 20.  L.H. testified defendant performed the Pap smear using gloves and a speculum, with an assistant present.  She visited defendant again a few weeks later, after being informed of an irregular test result.  During the follow-up examination, L.H. and defendant were alone.  While L.H. was lying flat on the examination table wearing a hospital gown, defendant stood between her legs, moving his fingers in and out of her vagina, without using gloves or a speculum.  Defendant inquired how she was feeling as he moved his fingers from side to side in her vagina, and ceased when she replied it did not hurt.

¶ 75    Defendant then said he was going to check her breasts and began pressing and touching them.  L.H. began to feel "this is not right."  After defendant stopped touching L.H.'s breasts, he asked her to move to the bottom of the examination table and bend over, because he needed her uterus to fall to the front.  Defendant then placed his fingers inside her vagina again.  When defendant stopped and communicated to her she could clothe herself, L.H. asked him the purpose of the examination, because it seemed there "was just too much going on."  Defendant informed her he was checking for cancer cells.  L.H. felt uncomfortable for the remainder of the day.

¶ 76    L.H. informed her date that evening what had occurred, and he suggested she should report the incident to someone.  The following day, she watched a television talk show about patients who had been assaulted by their physicians.  L.H. became disgusted and had a talk with her mother, who worked for a police department.  Thereafter, L.H. and her mother went to the police station, where L.H. filed a complaint.  L.H. was contacted by an assistant State's Attorney

in August 1992, when she was informed no charges would be filed because it would be L.H.'s word against defendant's word.  L.H. has since had pelvic examinations from other doctors, none of which were similar to the follow-up examination by defendant.  On September 28, 2007, L.H. went to the Berwyn police department after her mother learned the police were asking women who were victims of defendant to step forward.  L.H. and her mother brought the 1992 police report to the police station.

¶ 77     On cross-examination, L.H. acknowledged her first visit to defendant's office was in June 1991 and testified she waited for her yearly checkup to have a Pap smear performed.  L.H. also acknowledged her medical records indicated defendant treated her for human papillomavirus and genital warts, but she denied she ever had a sexually transmitted disease.  L.H. further acknowledged her original police report indicated the follow-up examination occurred on June 30, 1992, but she did not know why that date appeared in the report, noting the incident occurred over 20 years prior to her testimony.

¶ 78     The State also introduced a victim impact statement in aggravation of the offense.  The statement indicated M.S.'s husband has become angry and hostile, blaming her for the assault.  M.S.'s sons cannot comprehend how the assault occurred.  Her daughter feels a certain distrust of medical professionals.

¶ 79     In mitigation of the offense, defense counsel introduced numerous letters of support from defendant's patients.  Defense counsel also submitted a sentencing memorandum highlighting defendant's accomplishments.  Defendant stated in allocution that his purpose in life was to help the poor, sick, and disadvantaged.

¶ 80     The trial judge indicated defendant was considered a pillar of the community by his colleagues and his patients.  The trial judge also observed defendant had saved lives.  After

considering several mitigating factors, however, the trial judge found none of them applicable to this case. The trial judge also considered a number of factors in aggravation of the offense, observing defendant had a history of criminal activity and abused his position of authority and trust. Accordingly, the trial judge sentenced defendant to serve 13 years in the Illinois Department of Corrections.

¶ 81    Defendant filed a motion to reconsider his sentence. Although the motion is not included in the record on appeal, exhibits apparently attached to the motion and the May 23, 2013, transcript of the hearing on the motion are included in the record under seal. The transcript indicates defendant sought the opportunity to depose L.H. or, in the alternative, subpoena her medical records. The State responded the defense had an adequate opportunity to confront L.H., who had been disclosed as a witness for months. The State also argued that if the defense had wanted to argue L.H.'s follow-up examination was conducted in accordance with reasonable medical standards, the defense could have offered testimony and evidence on that question during the sentencing hearing. The trial judge denied the motion to reconsider. On June 17, 2013, defendant filed a notice of appeal to this court.

¶ 82                                  II. ANALYSIS

¶ 83    On appeal, defendant argues the trial court erred in: (1) granting the State's motion to reconsider and reinstating the verdict, based on the admissibility of other-crimes evidence; (2) failing to admit subpoenaed medical records or publish certain medical records to the jury; (3) precluding or limiting the examination of witnesses; and (4) imposing an excessive sentence based in part on limiting the cross-examination of a witness. We address defendant's arguments in turn.

¶ 84                                A. Other-Crimes Evidence

¶ 85    Defendant initially contends the trial judge erred in granting the State's motion to reconsider her decision to grant a new trial based on the admission of the other-crimes evidence. "The purpose of a motion to reconsider is to bring to the trial court's attention changes in the law, errors in the court's previous application of existing law, and newly discovered evidence not available at the time of the hearing." *People v. Bryant*, 369 Ill. App. 3d 54, 60 (2006). "Public policy favors correcting errors at the trial level, and a timely motion to reconsider is an appropriate method to direct the trial court's attention to a claim of error." *Id*. at 60-61. Indeed, " '[a] court in a criminal case has inherent power to reconsider and correct its own rulings, even in the absence of a statute or rule granting it such authority.' " *Id*. at 61 (quoting *People v. Mink*, 141 Ill. 2d 163, 171 (1990)). The trial court's power to reconsider extends to both interlocutory and final judgments. *Id.* (citing *Mink*, 141 Ill. 2d at 171). The trial court's order granting a new trial is interlocutory and the trial judge has the authority to reconsider it. *Id*. "When reviewing a motion to reconsider that was based only on the trial court's application (or purported misapplication) of existing law, as opposed to [one] based on new facts or legal theories not presented in the prior proceedings, our standard of review is *de novo*." (Internal quotation marks omitted.) *Bank of America., N.A. v. Ebro Foods, Inc.*, 409 Ill. App. 3d 704, 709 (2011).

¶ 86    We note, however, that the trial court granted the motion to reconsider based on its ruling on the admissibility of the other-crimes evidence. We review the trial court's admission of other-crimes evidence under an abuse of discretion standard and will not reverse the trial court's decision unless the decision is " 'arbitrary, fanciful or unreasonable' or 'where no reasonable man would take the view adopted by the trial court.' " (Internal quotation marks omitted.) *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 27 (quoting *People v. Donoho*, 204 Ill. 2d 159, 182

(2003)); *People v. Ward*, 2011 IL 108690, ¶ 21. Further, a posttrial motion for a new trial is a matter for the trial court's discretion, so that we will not disturb the denial of such a motion absent a showing that the trial court abused its discretion. *People v. Hall*, 194 Ill. 2d 305, 343 (2000). We thus review this issue under an abuse of discretion standard.

¶ 87 In this case, the trial judge's rulings address the admission of other-crimes evidence. "Traditionally, evidence relating to a defendant's propensity to commit crimes has been excluded from criminal trials because it tends to be overly persuasive to a jury, who may 'convict the defendant only because it feels he or she is a bad person deserving punishment.' " *Ward*, 2011 IL 108690, ¶ 24 (quoting *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980)). "Other-crimes evidence is admissible * * * to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case * * * ." *Donoho*, 204 Ill. 2d at 170. "In Illinois, however, our legislature has chosen to provide a limited exception to this general rule of inadmissibility for other-crimes evidence intended to show the defendant's propensity to commit crimes." *Ward*, 2011 IL 108690, ¶ 25. "If a defendant is tried on one of the enumerated sex offenses, section 115-7.3(b) of the Code [citation] allows the State to introduce evidence that the defendant also committed another of the specified sex offenses." *Id*. Our supreme court has upheld the constitutionality of section 115-7.3. *Donoho*, 204 Ill. 2d at 182.

¶ 88 "Even if other-crimes evidence falls under one of these exceptions, the court still can exclude it if the prejudicial effect of the evidence substantially outweighs its probative value." *Id*. at 170. In the context of weighing whether to admit other-crimes evidence regarding sex offenses pursuant to the Code:

"[T]he court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances."  725 ILCS 5/115-7.3(c) (West 2008).

In this case, the trial judge granted the State's pretrial motion to admit other-crimes evidence on the issues of intent, lack of innocent frame of mind, and propensity.  In considering defendant's posttrial motion and the State's motion to reconsider, the trial judge focused on the issue of propensity.  Accordingly, we will address the admission of the evidence on the question of propensity, as it is determinative of the issue on appeal.

¶ 89                                    1. Proximity

¶ 90     Defendant asserts "proximity in time between the charged offense and the other crimes was clearly lacking" in this case.  Our supreme court has "decline[d] to adopt a bright-line rule about when prior convictions are *per se* too old to be admitted under section 115-7.3.  Instead, it is a factor to consider when evaluating its probative value." *Donoho*, 204 Ill. 2d at 183-84.  In *Donoho*, our supreme court observed where the evidence was sufficiently credible and probative, that Illinois appellate courts and federal courts have affirmed the admission of other-crimes evidence that occurred more than 20 years prior to the charged offense. *Id*. at 184.  The *Donoho* court considered other crimes that occurred 12 to 15 years earlier and held, "while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it." *Id*.  Similarly, in *People v. Taylor*, 383 Ill. App. 3d 591, 595 (2008), this court concluded that a six-year gap between the other-crimes evidence and the charged offense was not significant.  As noted by our supreme court in *Donoho*, the admissibility of other-crimes

evidence should not be controlled solely by the number of years elapsed between the prior offense and the charged crime, but should instead be evaluated on a case-by-case basis. *Donoho*, 204 Ill. 2d at 183.

¶ 91 In this case, M.S. was assaulted on March 24, 2005. B.S. testified regarding incidents occurring between 2005 and 2007. N.R. testified regarding incidents occurring between 2006 and 2007. These other crimes are substantially more proximate in time to the charged offense than those at issue in *Donoho*. See *id.* at 184. Accordingly, the other crimes would have greater probative value than those in *Donoho*, and this factor would not compel a finding that the trial court abused its discretion in this case. *Id.*

¶ 92                                   2. Factual Similarity

¶ 93 Defendant also asserts the facts and circumstances of the other-crimes evidence differed significantly from the conduct alleged in the charged offense. "[T]o be admissible, other-crimes evidence must have 'some threshold similarity to the crime charged.' " *Id.* (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). "As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence." *Id.* "Where such evidence is not being offered under the *modus operandi* exception, 'mere general areas of similarity will suffice' to support admissibility." *Id.* (quoting *People v. Illgen*, 145 Ill. 2d 353, 373 (1991)). No two crimes are identical and so the existence of some differences does not necessarily defeat admissibility. *People v. Smith*, 2015 IL App (4th) 130205, ¶ 24.

¶ 94 In this case, defendant points out that M.S. alleged forced sexual intercourse, while N.R. and B.S. alleged lesser forms of sexual misconduct. Defendant also notes M.S. alleged a single instance, while N.R. and B.S. alleged ongoing instances of misconduct. Defendant further indicates M.S. contends she was assaulted during treatment for pneumonia, while N.R. and B.S.

were primarily treated for depression.

¶ 95   We find this court's decision in *People v. Cerda*, 2014 IL App (1st) 120484, instructive on this point.  In *Cerda*, the defendant was charged with criminal sexual assault against his then-teenage stepdaughter, J.M.  *Id*. ¶ 5.  The trial judge ruled the State could submit evidence of the defendant's prior assault against J.M. and a subsequent assault of Y.C., another stepdaughter.  *Id*. ¶¶ 13-15.  On appeal, the defendant argued the offenses against Y.C. were not sufficiently similar to the crimes against J.M. to be admitted because: "(1) none of the offenses described by Y.C. involved intercourse, as they had with J.M.; (2) J.M. did not describe the offenses as occurring when she was asleep, whereas Y.C. described two of the offenses starting that way; and (3) one of the events against Y.C. occurred in a vehicle, whereas none of the offenses against J.M. occurred in a vehicle."  *Id*. ¶ 189.  The appellate court found there were some differences, but the offenses were sufficiently similar to be admitted.  *Id*. ¶ 190.  The *Cerda* court noted the offenses both involved the defendant's stepdaughters, who were left alone in his care.  *Id*.  Both victims were similar in age.  *Id*.  Two of the offenses related by Y.C. occurred in the defendant's home, as did those related by J.M.  *Id*.  There was also evidence that the defendant engaged in suspicious or improper conduct towards both girls in his vehicle.  See *id*.

¶ 96   In this case, M.S., N.R., and B.S. all had the same relationship to defendant, *i.e*., the doctor-patient relationship.  The evidence demonstrated that the women were in the same age range and all had been diagnosed with depression, although the other crimes occurred during other treatments.  Each incident occurred in defendant's examination rooms, when the women were partially undressed.  Two of the women testified to observing defendant's erection during the incidents.  In each case, defendant touched the vaginal area.  The women each had said "no" or otherwise indicated the behavior was inappropriate.  The incidents also occurred when

defendant was in close proximity to the women who were on an examination table. The fact that M.S. alleged forced sexual intercourse, while N.R. and B.S. alleged lesser forms of sexual misconduct, is insufficient to conclude that the trial judge abused her discretion. See *id*. In each situation, defendant took advantage of female patients in his examination rooms with whom he had a doctor-patient relationship. These similarities are sufficient to support the admissibility of the other-crimes evidence. *Donoho*, 204 Ill. 2d at 184. Accordingly, defendant's argument on this point is not persuasive.

¶ 97                    3. Other Relevant Facts and Circumstances

¶ 98    Defendant argues the admission of the other-crimes evidence resulted in "mini-trials" within his trial that inflamed the jury and steered them from the focus of the true issue for determination. "Even when relevant and probative, other-crimes evidence must not become a 'focal point' of the trial." *People v. Smith*, 406 Ill. App. 3d 747, 755 (2010) (quoting *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006)). "In admitting evidence of other crimes to show propensity, a trial court 'should not permit a "mini-trial" of the other, uncharged offense[s], but should allow only that which is necessary to "illuminate the issue for which the other crime was introduced." [Citation.]' " *Id.* (quoting *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001)). "Accordingly, a 'large volume' of evidence of other crimes 'may make probative other-crimes evidence overly prejudicial,' and courts should limit the amount of other-crimes evidence when the defendant's propensity can be established by only 'a few instances of uncharged conduct' or by some other admissible evidence." *Id.* (quoting *People v. Cardamone*, 381 Ill. App. 3d 462, 496-97 (2008)).

¶ 99    Defendant compares his case to *Cardamone*, in which the appellate court held the volume of the other-crimes evidence that was presented to the trial court was overwhelming and

27

undoubtedly more prejudicial than probative. *Cardamone*, 381 Ill. App. 3d at 497. In

*Cardamone*, however, the trial court admitted testimony regarding what the appellate court

conservatively estimated to be between 158 and 257 uncharged acts. *Id*. at 491. The appellate

court noted that, "unlike a case where the trial court might admit other-crimes evidence as it

pertains to 1 or even 2 victims, the court here found admissible numerous acts alleged by 15

victims." *Id*. at 494. Further, the "admission of so many allegations of uncharged conduct, many

of which were vague as to dates, placed defendant in the impossible position of accounting for

his whereabouts and behavior almost all day, every day, over a three-year period." *Id*. "Simply

put, *Cardamone* was an extreme case." *People v. Perez*, 2012 IL App (2d) 100865, ¶ 49.

¶ 100   In this case, the trial included testimony from only two victims other than M.S. The

number of incidents of sexual misconduct is much smaller than in *Cardamone*. The incidents

were alleged to have occurred during scheduled medical appointments, which resulted in more

specific allegations than those at issue in *Cardamone*. This factor, therefore, would not compel a

finding that the trial court abused its discretion in this case. See *Smith*, 406 Ill. App. 3d at 755.

¶ 101   Further, we note that defendant was not convicted or charged for his misconduct with

respect to N.R. and B.S. Illinois courts have, however, found the admission of other-crimes

evidence to be proper regardless of any conviction or charges relating to the offenses in the

other-crimes evidence. In *Braddy*, the appellate court found no abuse of discretion in admitting

evidence of an uncharged sexual misconduct, finding the evidence to be credible and probative.

*Braddy*, 2015 IL App (5th) 130354, ¶ 43. In *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 45,

this court found no abuse of discretion in admitting evidence of an uncharged sexual offense to

demonstrate propensity.

¶ 102   Finally, our resolution of the foregoing issues renders it unnecessary to reach defendant's

argument that the trial judge erred in admitting the other-crimes evidence on the issues of intent and lack of innocent frame of mind. Evidence admissible for one purpose is not affected by inadmissibility for another. *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 51 (citing *People v. Carter*, 38 Ill. 2d 496, 504 (1967)); *People v. Boyd*, 366 Ill. App. 3d 84, 91-95 (2006) (finding the trial court improperly admitted other-crimes evidence for common design, but rejecting the defendant's argument that the trial court improperly admitted the other-crimes evidence because evidence was admissible for propensity). Accordingly, the trial court did not abuse its discretion in admitting the other-crimes evidence in this case. Thus, defendant's argument that the trial judge erred in granting the State's motion to reconsider and denying defendant's motion for a new trial is not persuasive.

¶ 103                          B. Discovery of Medical Records

¶ 104   Defendant next contends the trial judge erred by denying his discovery request for all of the medical records of M.S., N.R., and B.S., including records relating to their mental health. Defendant argues the medical records were material and relevant to the credibility of these witnesses and suggests he was denied his constitutional right to confront the witnesses against him and his right to due process of law. A trial court's decision on whether to limit discovery is reviewed for an abuse of discretion. *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008). This court, however, reviews *de novo* whether a defendant was denied due process and, if so, whether that denial was prejudicial. *Id*.

¶ 105   We find two cases instructive on this issue. First, in *People v. Bean*, 137 Ill. 2d 65 (1990), the Illinois Supreme Court held that a defendant was not denied his sixth amendment right of cross-examination or his fourteenth amendment right to a fair trial by the trial court's refusal to order disclosure of a witness's mental health records. *Id*. at 99-100 (citing U.S. Const.,

amends. VI, XIV). The *Bean* court approved the procedure whereby the trial court conducted an *in camera* inspection of the witness' mental health records to determine whether they contained relevant information that could be used to impeach the witness. *Id.* The court, observing the records were privileged under the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1979, ch. 91 1/2, ¶ 801 *et seq.*), found that such privilege must give way to a defendant's sixth and fourteenth amendment rights only to the extent that the trial court determined the privileged information to be relevant and impeaching. *Bean,* 137 Ill. 2d at 100. Further, "just as a trial judge can limit cross-examination to prevent inquiries that are irrelevant, repetitive, or too time-consuming, that harass the witness, or that threaten to distract the jury from the actual issues by unduly emphasizing details of the witness' life," the judge may also limit a defendant's access to statutorily privileged information. *Id.* at 100-01. When the patient or a therapist asserts the privilege, a trial judge may review a witness' mental health records *in camera* and disclose only those portions that are relevant when that relevance is not outweighed by other factors. *Id.* at 101.

¶ 106  Second, in *People v. Printy*, 232 Ill. App. 3d 735 (1992), the appellate court followed the decision in *Bean* and affirmed the trial court's refusal to release mental health records. *Id.* at 744-46. The defendant in *Printy* had sought, in a motion for additional discovery, to examine the mental health records of the victim. *Id.* at 744. Those records, which apparently had been reviewed by the State's Attorney's office, were then reviewed *in camera* by the trial court. *Id.* At the hearing following the trial court's *in camera* review, the court allowed the defendant to review the victim's intake report to a hospital, but refused to give the defendant access to the remaining reports because it found the records contained no statements of the victim relating to the incident in question. *Id.* The trial court further found nothing in the reports relevant to the

truth or veracity of the victim, relevant to her memory or perception, or of an impeaching nature. *Id*. The appellate court, following *Bean*, concluded the procedure followed by the trial court struck the proper balance between the defendant's right to access information relevant to the credibility of a key witness and the need to maintain the confidentiality of the victim's mental health records. *Id*. The appellate court also reviewed the victim's mental health records submitted to the trial court and agreed those records contained no additional material relevant to the cross-examination or impeachment of the victim. *Id*. at 744-45. The *Printy* court further rejected the defendant's argument that the victim had waived her privilege of confidentiality because the trial judge had already determined the records were irrelevant and the defendant had acquiesced in the trial court's procedure. *Id*. at 745.

¶ 107 In this case, the State objected to defendant's discovery request. Defendant, in replying to the objection, expressly assumed the State was doing so on behalf of the witnesses and specifically requested the trial judge's *in camera* review. The trial court followed the procedure established by *Bean* and *Printy* and ruled the sealed medical records were not relevant to the trial. Accordingly, we conclude the procedure did not violate defendant's right of cross-examination and right to due process of law. *Bean*, 137 Ill. 2d at 100-01; *Printy*, 232 Ill. App. 3d at 744. In addition, we observe defendant did not include the mental health records sealed by the trial court in the record on appeal.[9] We resolve any doubts arising out of this incompleteness of the record against defendant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Therefore, defendant's argument on this point is not persuasive.

---

[9] Defendant filed a supplemental record containing sealed records, but these sealed records included only a transcript of the sentencing hearing and materials defendant submitted as an exhibit to his motion to reconsider the sentence.

¶ 108                    C. Publication of Medical Records

¶ 109   Defendant further contends the trial judge erred in refusing to publish the medical records admitted at trial to the jury.  Defendant maintains it was important for the jury to review the notes of what occurred during the examinations, which tests were performed or ordered, what treatments were prescribed, and who was present during examinations.  "The decision whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court."  *People v. McDonald*, 329 Ill. App. 3d 938, 947 (2002).  "We will not reverse that decision unless there is an abuse of discretion to the prejudice of the defendant."  *Id*. at 948.

¶ 110   Defendant relies entirely on *Troyan v. Reyes*, 367 Ill. App. 3d 729 (2006).  In *Troyan*, the trial court prohibited the plaintiff from publishing medical records to the jury because the physician and physical therapist were not available to testify about the opinions contained therein.  *Id*. at 736.  The appellate court reversed the trial court's ruling, finding that diagnoses and opinions contained in medical records should be admissible and published to the jury as a proper part of the business records exception to the hearsay rule, due to their inherent reliability and trustworthiness.  *Id*. at 734-35.  The *Troyan* appellate court, however, also indicated that this holding "does not give parties free rein to introduce medical records as a substitute for expert medical testimony.  Like all business records, medical records may be excluded if they are not relevant or are too complex for the jury to understand on its own."  *Id*. at 736.

¶ 111   In this case, unlike in *Troyan*, Jaqueline, Debra, and defendant provided testimony to the jury regarding relevant portions of the medical records of M.S., N.R., and B.S.  Moreover, unlike in *Troyan*, defendant did not seek to introduce the medical records in this case to establish expert medical opinions and diagnoses, but to contradict the testimony of M.S., N.R., and B.S. regarding what occurred during their examinations.  The trial judge declined to send the medical

records to the jury on confidentiality grounds, which is an issue not addressed by *Troyan* or defendant. Moreover, the trial judge denied defendant's posttrial motion regarding the refusal to provide the medical records to the jury on the ground that the records contained coding that would have been confusing to the jury. This reasoning was consistent with the *Troyan* court's admonition that medical records may be excluded if they are too complex for the jury to understand on its own. *Id*. Accordingly, we conclude defendant has failed to demonstrate the trial judge abused her discretion in declining to send the medical records to the jury.

¶ 112                    D. Limitations of Cross-Examination

¶ 113   Defendant next argues the trial judge erred by limiting the cross-examination of witnesses against him. A defendant has a federal and state constitutional right to confront witnesses against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. This right includes cross-examining witnesses to show any interest, bias, prejudice or motive to testify falsely. *People v. Klepper*, 234 Ill. 2d 337, 355 (2009); *People v. Averhart*, 311 Ill. App. 3d 492, 496-97 (1999). Nevertheless, "[t]he latitude to be allowed on cross-examination rests within the sound discretion of the trial court; a reviewing court should not interfere absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Hall*, 195 Ill. 2d 1, 23 (2000); see *People v. Nutall*, 312 Ill. App. 3d 620, 627-28 (2000). Further, "[a] trial judge retains wide latitude to impose reasonable limits based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *Klepper*, 234 Ill. 2d at 355 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). The court

looks to what the defendant had been allowed to do, not to what the defendant was prohibited from doing, to evaluate the constitutional sufficiency of cross-examination. *People v. Truly*, 318 Ill. App. 3d 217, 233 (2000). The reception of evidence collateral to an issue in a case and intended to affect the credibility of a witness rests usually within the discretion of the trial court. *Printy*, 232 Ill. App. 3d at 745.

¶ 114   In this case, the trial judge sustained the State's objection to cross-examination of M.S. on whether she had lied to the State about visiting other doctors in the United States after the incident. Defendant, however, had already elicited damaging testimony from M.S. on cross-examination. M.S. testified it was not uncommon for defendant's employees to enter the examination room during an examination. M.S. further testified that defendant pulled down her pants, which she had not testified to during direct examination. M.S. also acknowledged this was the "fifth different story" she had provided about the alleged assault. Further, M.S. testified her sister met with defendant 10 times after the incident, but that she did not inform her sister of the incident. The questions of whether M.S. visited doctors in the United States after the incident and whether M.S. accurately conveyed this to the prosecutors were of marginal relevance, particularly in light of the cross-examination defendant accomplished with M.S. Accordingly, defendant has failed to establish that the trial court abused its discretion in limiting cross-examination on this subject matter.

¶ 115   The trial judge also limited the cross-examination of B.S. regarding the lawsuit ostensibly filed on her behalf. Specifically, the trial judge ruled B.S. could be cross-examined regarding whether she was aware of a lawsuit filed two years after the final incident, but that defense counsel could not impeach B.S. with a document she had not signed and of which she might not be aware. Generally, an unsigned complaint cannot be used to impeach a witness. *Ryan v.*

*Mobil Oil Corp*., 157 Ill. App. 3d 1069, 1081-82 (1987); *Mantia v. Kaminski*, 89 Ill. App. 3d 932, 937 (1980). Accordingly, we conclude defendant has failed to demonstrate the trial court abused its discretion in limiting cross-examination of M.S. and B.S.

¶ 116                                        E. Sentencing

¶ 117   Lastly, defendant argues the trial judge committed two errors during his sentencing hearing. First, defendant contends the trial judge erred by limiting the cross-examination of L.H. Second, defendant argues the trial judge failed to properly weigh the aggravating and mitigating factors by relying in large part on L.H.'s testimony. We address these arguments in turn.

¶ 118   Regarding the cross-examination of L.H., it is well settled that the "ordinary rules of evidence are relaxed at the aggravation/mitigation stage of sentencing." *People v. Terrell*, 185 Ill. 2d 467, 505 (1998); *People v. Cloutier*, 178 Ill. 2d 141, 158 (1997). A sentencing court has broad discretionary power to consider various sources and types of information so that it can make a sentencing determination within the parameters outlined by the legislature. *People v. Harris,* 375 Ill. App. 3d 398, 408 (2007), *aff'd,* 231 Ill. 2d 582 (2008) (citing *People v. Williams*, 149 Ill. 2d 467, 490 (1992)). The latitude permitted in the cross-examination of witnesses at trial is a matter within the discretion of the trial court; no more restrictive rule should be imposed during a sentencing hearing, when the guilt of the defendant is no longer an issue and the trial court is seeking all proper information to assist it in determining the question of punishment. *People v. Adkins*, 41 Ill. 2d 297, 302 (1968). The court's ruling on the character and scope of cross-examination at a sentencing hearing will not be overturned on appeal absent an abuse of discretion which results in manifest prejudice to the defendant. *People v. Thompson*, 234 Ill. App. 3d 770, 778 (1991).

¶ 119   In this case, defendant claims L.H.'s full medical records could have provided the

opportunity to impeach or effectively cross-examine her regarding the necessity of the follow-up examination. During cross-examination, L.H., acknowledged her medical records indicated defendant treated her for human papillomavirus and genital warts. L.H. also denied she ever had a sexually transmitted disease. Further, assuming *arguendo* that other medical records would corroborate that L.H. had a sexually transmitted disease, defendant may have been able to establish a follow-up examination was necessary, but he could not establish that the follow-up examination was a professional examination, as opposed to sexual misconduct. Defendant presented no evidence during the sentencing hearing on this latter issue, as the State noted during the hearing on defendant's motion for reconsideration of the sentence. Given this record, defendant cannot establish manifest prejudice resulting from the trial court's limitation of cross-examination.

¶ 120   Defendant further contends the trial judge failed to properly weigh the aggravating and mitigating factors by relying on L.H.'s testimony. The trial court has broad discretionary powers to fashion an appropriate sentence within the statutory limits prescribed by the legislature. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A court is not bound by the usual rules of evidence in determining a sentence, but may search anywhere within reasonable bounds for other facts which may serve to aggravate or mitigate the offense. *Harris*, 375 Ill. App. 3d at 408. The trial court may inquire into a defendant's general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, and stimuli motivating his conduct, in addition to his family life, occupation, and criminal record. *Id*. at 408-09. This inquiry is limited only by the prerequisite that the information considered be accurate and reliable as determined by the trial court within its sound discretion. *Id*. at 409. Although the sentencing judge is not limited to considering only information which would be admissible under

the adversary circumstances of a trial, the judge must exercise care to insure the accuracy of information considered and to shield herself from the potentially prejudicial effect of improper materials.  See *People v. La Pointe*, 88 Ill. 2d 482, 494-95 (1981).

¶ 121   "A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *Fern*, 189 Ill. 2d at 53; see *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court. *Alexander*, 239 Ill. 2d at 212.  A sentence will be deemed an abuse of discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 122   In this case, defendant argues the trial judge's analysis was improperly influenced by L.H.'s testimony, which led her to conclude defendant had a history of criminal activity and his conduct was not the result of circumstances unlikely to recur.  Defendant asserts L.H.'s testimony was "simply unreliable."  For the reasons already stated, however, defendant had an adequate opportunity to cross-examine L.H. at the sentencing hearing.  Moreover, defendant submitted documentary evidence under seal that he believed would discredit L.H.[10]  The trial court, which was in a better position to assess L.H.'s credibility (*People v. Williams*, 303 Ill. App. 3d 264, 268 (1999)), chose to rely on L.H.'s testimony.  In addition, even if L.H.'s testimony was dismissed as incredible, the testimony adduced at trial established defendant's propensity to commit criminal sexual assault against his patients over a period of years.  Accordingly, defendant has failed to

---

[10] This material was also submitted to this court under seal, albeit without defendant's motion to reconsider the sentence.

establish the trial judge improperly applied the factors in aggravation and mitigation of the offense.

¶ 123                                III. CONCLUSION

¶ 124   For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 125   Affirmed.