# Illinois Official Reports

## Appellate Court

***People v. Brown*, 2018 IL App (4th) 160288**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES J. BROWN, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-16-0288 |
| Filed<br>Rehearing denied | September 25, 2018<br>October 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 11-CF-1658; the Hon. Thomas J. Difanis, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Bradley Jarka, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Knecht and Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant, Charles J. Brown, was convicted of two counts of home invasion (720 ILCS 5/12-11(a)(3) (West 2010)) and sentenced to two concurrent 35-year prison terms. On direct appeal, this court vacated one of defendant's convictions and sentences pursuant to the one-act, one-crime doctrine but otherwise affirmed the trial court's judgment. *People v. Brown*, 2014 IL App (4th) 120692-U. In June 2014, defendant filed a postconviction petition, which advanced to the second stage of postconviction proceedings. At the second stage, the State filed a motion to dismiss. The trial court partially denied that motion and allowed the matter to advance to a third-stage evidentiary hearing on certain issues. Ultimately, the matter was transferred to another judge, who *sua sponte* revisited the State's motion to dismiss and then dismissed defendant's postconviction petition in its entirety. Defendant appeals, arguing the successor judge erred in *sua sponte* dismissing his petition. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3        On September 26, 2011, two armed and masked intruders entered the home of Lillie Seals, located at 1106 West Eureka Street in Champaign, Illinois, while she and her three children were present, and began making various demands. Seals's boyfriend, Dejwan Green, subsequently entered the residence and shot at the two intruders, who then fled the scene. Shortly following the incident, police officers learned that defendant and another individual, Mario Dorsey, had separately been taken to a local hospital for gunshot wounds. While hospitalized, defendant was twice interviewed by the police. The record reflects he reported that he had been shot following a dice game at the Eureka Street residence by an individual who was upset about losing money. According to defendant, he jumped out a bedroom window of the residence, crawled to the street, and called his son to pick him up and take him to the hospital. On October 7, 2011, the State charged defendant with two counts of home invasion while armed with a firearm (720 ILCS 5/12-11(a)(3) (West 2010)).

¶ 4        On January 24, 2012, defendant filed a motion to suppress statements he made to the police while hospitalized on October 3 and 5, 2011. He argued his statements were (1) made during custodial police interrogations and without the benefit of *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and (2) involuntary because he was hospitalized, recovering from surgery, and under the influence of medication.

¶ 5        On March 15, 2012, a hearing on defendant's motion was conducted before Judge Harry E. Clem. The State presented the testimony of Donald Shepard, a detective for the Champaign Police Department. Shepard stated he investigated the reported home invasion at Seals's residence and, on October 3 and 5, 2011, spoke with defendant at the hospital. According to Shepard, defendant provided similar statements on both dates but only defendant's second statement was recorded. He asserted he spoke with medical personnel prior to conversing with defendant on both dates but was never advised that defendant was not in a condition to be interviewed.

¶ 6        On October 3, 2011, Shepard spoke with defendant at approximately 2:30 p.m. for 30 to 45 minutes. He testified defendant was in his hospital bed and recovering from his injuries. No charges had been filed against him at that time, and Shepard denied that the hospital had been directed to hold defendant for the police department. Shepard testified defendant was not handcuffed or restrained. He also did not tell defendant that he was under arrest or that he was

not free to leave. When speaking with defendant, Shepard denied noticing anything unusual. He stated that, although defendant "was obviously recovering and in some pain," he seemed "very aware of what was going on around him," spoke coherently, recognized Shepard from previous contacts, provided information that matched information his girlfriend had previously reported to Shepard, and telephoned his girlfriend so that she could get in contact with his son. According to Shepard, defendant did not appear drowsy or have slurred speech. Shepard testified he did not notice anything that caused him to believe defendant was under the effects of drugs or medication. Additionally, defendant never indicated that he did not want to talk to Shepard.

¶ 7    Shepard testified he returned to the hospital to speak with defendant on October 5, 2011, at around 4 p.m. for approximately 30 minutes. Another detective accompanied him to defendant's hospital room. Shepard denied ever telling defendant that he was under arrest or that he was not free to leave. Shepard also testified defendant was not handcuffed or restrained. He did not read defendant his *Miranda* warnings, stating that, in his mind, defendant was not in custody at that time. Shepard testified he obtained permission from defendant to record his statement. Again, he asserted that defendant's ability to communicate did not appear to be affected by medication or drugs. Shepard denied that defendant appeared sleepy or that he fell asleep during their conversation. According to Shepard, defendant never indicated that he did not want to talk. On October 6, 2011, defendant was released from the hospital and taken into police custody.

¶ 8    On cross-examination, Shepard testified that, following his October 5 interview with defendant, he informed desk personnel at the hospital to notify him of defendant's release because Shepard was planning to arrest him. He did not inform defendant that he was going to be arrested until October 6, 2011. Shepard stated he was aware that defendant had suffered gunshot wounds, undergone surgery, and that he had been intubated on October 3. Shepard acknowledged that he did not know what medications defendant was on at the time of their interviews. He also acknowledged that he did not ask medical personnel what medications defendant was taking or the effect that such medication would have on defendant's cognitive abilities. However, Shepard asserted he did ask if defendant was "coherent and able to be interviewed, in a condition where [Shepard] could talk to him." According to Shepard, medical personnel informed him that "yes, [defendant was] coherent" and that defendant knew where he was and what was going on. Additionally, Shepard testified that during their interview on October 5, defendant got out of bed and "walked across the room to the bathroom."

¶ 9    Defendant testified he was admitted to the hospital on September 26, 2011, and was suffering from gunshot wounds. He underwent surgery and was given medication to help him sleep and for pain. According to defendant, his pain medications included morphine, fentanyl, and OxyContin. Defendant testified his medications were administered both orally and intravenously, and he was on pain medication during his entire hospital stay. He stated he was hooked up to a "medication machine" and could push a button every 10 minutes to receive pain medication. Defendant asserted he did not recall everything that happened during his first few days in the hospital and had no recollection of his October 3 interaction with Shepard. He did recall Shepard's October 5 visit and stated he was still in pain and hooked up to machines. Defendant asserted he felt sleepy and told Shepard he did not want to speak to him. He testified he was "in and out" of consciousness while Shepard questioned him. Further, defendant denied

that he exited his hospital bed on October 5 as asserted by Shepard, stating he "couldn't walk" and "couldn't get out of the bed."

¶ 10    On cross-examination, defendant testified that he did recall portions of Shepard's October 3 visit. Specifically, he remembered that Shepard told him they were "going to talk about old times" and that his son telephoned while Shepard was present. Defendant testified he did not recall making the statements on October 3 that were attributed to him by Shepard.

¶ 11    Following the parties' arguments, Judge Clem denied defendant's motion to suppress. Initially, he found defendant's statements were not made during the course of a custodial interrogation. Further, he found Shepard's testimony more credible than defendant's regarding whether defendant was coherent and responsive when Shepard interviewed him. In setting forth his decision, Judge Clem noted as follows: "[T]here is no medical testimony presented here as to the [effects] of any of the medication. The defendant understands it to have been pain medication, but many people take pain medication for a variety of different reasons and the [effects] of it are something that is subject to testimony by somebody who is, in fact, versed in such matters which we did not hear today."

¶ 12    Prior to trial, defendant also raised *pro se* claims that his court-appointed attorney was providing ineffective assistance. He requested a change in counsel, alleging, in part, that his counsel failed to "file certain case laws" or "read certain things" to the trial court in connection with his motion to suppress. Following a hearing, the court denied defendant's motion.

¶ 13    In May 2012, defendant's jury trial was conducted with Judge Clem presiding. The State's evidence showed that, on September 26, 2011, Seals resided in a house located at 1106 West Eureka Street in Champaign. That evening, she was home with her three children—two sons, ages 15 and 8, and a daughter, age 1—when two masked and armed intruders entered the home and began making various demands. Seals testified and described the intruders as black men, wearing hoodies, jeans, and ski masks. She stated the intruders pushed her and her sons into a bedroom and onto the floor. Upon request, Seals was permitted to retrieve her daughter from another room. She testified she was accompanied by one of the intruders at gunpoint. She then heard multiple gunshots and hid in a closet with her daughter. Seals testified she heard a window break and, once it became quiet, she returned to the bedroom her sons had been in and noticed that the window was open. She stated a window in her own bedroom had been broken.

¶ 14    Seals's 15-year-old son, Dominic, provided testimony that was substantially similar to that provided by Seals. He stated that, after the shooting started, he "hopped out the [bedroom] window" and ran to a neighbor's house to call police while his little brother hid in the closet. Dominic testified he made two 9-1-1 calls. Recordings of the calls were played for the jury.

¶ 15    Dejwan Green testified he was in a relationship with Seals and spent time at her home. On the evening of September 26, 2011, he went to Seals's residence and noticed the dog "barking like crazy." He also observed that the back door was open and heard screaming and pleading. Green testified he retrieved his gun from the garage and "eased" his way into the house. Inside, he heard unfamiliar male voices and observed two men in dark colored clothing holding guns against Seals and the children. Green stated he fired shots at the men, and one of the men returned fire. Green retreated to the kitchen to "regroup" and heard glass breaking. He stated he observed the intruders "jumping out the window." Following the shooting, Green went to a friend's house and sold his gun. He acknowledged that he was a convicted felon and not allowed to possess a firearm.

¶ 16    Tina Gordon testified for the State that, in September 2011, she and defendant were dating. On September 26, 2011, she was at a birthday party with defendant's son, Devin Lindsey, when Lindsey received a telephone call from defendant. In response to that call, Gordon and Lindsey went to the 1100 block of West Eureka Street in Champaign and observed defendant hurt and "laying by some bushes" in the front yard of a residence located at 1108 West Eureka Street, which evidence showed was next door to Seals's home. Gordon stated she and Lindsey took defendant to the emergency room for treatment, reporting that he was a gunshot victim.

¶ 17    Shepard testified he investigated the alleged home invasion at 1106 West Eureka Street on September 26, 2011. That evening, he responded to Seals's residence and then Carle Hospital, stating he learned that two people with gunshot wounds had been taken there. Shepard identified those two individuals as defendant and Mario Dorsey. When he arrived at the hospital, defendant was in surgery. Shepard testified he subsequently interviewed defendant on two occasions, one of which was an interview on October 5, 2011, that was recorded. Both the recording and a transcript of the recording were admitted into evidence over defendant's objection. The recording was played at trial and the jury was given copies of the transcript.

¶ 18    Shepard further testified that he returned to Seals's residence on September 29, 2011, to look for evidence in both her yard and in neighboring yards. He stated he walked around the residence located at 1108 West Eureka Street, Seals's next-door neighbor. In small bushes at the front of that residence, Shepard found a stocking hat or mask. The State's evidence showed that swabs of the mouth area of the mask were taken at the Illinois State Police Forensic Science Laboratory in Springfield, Illinois. Dana Pitchford, a forensic scientist specializing in forensic biology and deoxyribonucleic acid (DNA) analysis, extracted DNA from the swabs. She found a mixture of DNA profiles from a swabbing of the inside of the mouth area of the mask and stated she "could pull out a major contributor." Pitchford compared the DNA profiles from the mask with defendant's DNA profile and determined "the major contributor profile [was] consistent with the DNA profile from [defendant]." She further testified as follows: "The probability of th[at] [DNA] profile appearing in the population is approximately one in 4.9 sextillion African Americans, one in 650 sextillion Caucasians[,] or one in 490 sextillion Southwest Hispanic individuals."

¶ 19    The State additionally presented testimony from police officers regarding bullet holes, shell casings, and projectiles found in Seals's residence. Defendant presented no witnesses and chose not to testify. At the conclusion of the trial, the jury found defendant guilty of both counts of home invasion. On June 25, 2012, the trial court sentenced defendant to two concurrent 35-year prison terms.

¶ 20    Defendant filed a direct appeal, arguing (1) his two convictions for home invasion violated the one-act, one-crime doctrine because they were both based on a single entry into the dwelling of another and (2) the trial court erred by failing to revisit his pretrial ineffective-assistance claims after his trial. On March 6, 2014, this court issued a decision agreeing with defendant's first contention and vacating one of his two convictions and 35-year prison sentences. *Brown*, 2014 IL App (4th) 120692-U, ¶ 30. We otherwise affirmed the trial court's judgment but remanded for the issuance of an amended sentencing judgment. *Id.*

¶ 21    On June 9, 2014, defendant filed a *pro se* postconviction petition. The trial court, Judge Clem presiding, permitted defendant's petition to proceed to the second stage of postconviction proceedings and appointed counsel to represent defendant. An amended postconviction petition was filed with the aid of appointed counsel, which the State moved to

dismiss. However, before the amended petition could be addressed, defendant moved to have his appointed counsel discharged and alternate counsel appointed. Ultimately, Judge Clem granted that motion and alternative counsel was appointed.

¶ 22 On July 29, 2015, defendant, with the aid of his newly appointed postconviction counsel, filed the amended petition for postconviction relief that is at issue on appeal. Defendant argued (1) the trial court erred in denying his motion to suppress because he had been subjected to a custodial interrogation without the benefit of *Miranda* warnings, (2) his trial counsel provided ineffective assistance, (3) his appellate counsel provided ineffective assistance of counsel, and (4) the trial court improperly imposed a more severe sentence on remand after one of his convictions and sentences had been vacated. With respect to his claim of ineffective assistance of trial counsel, defendant first argued, in part, that his counsel's performance was deficient during the suppression hearing for failing to present medical testimony regarding the effect of pain medication he was taking during his hospitalization. He alleged that his counsel's asserted basis for not presenting such testimony was that defendant's medical records described him as "alert and oriented." Defendant maintained, however, that it was error for his counsel to rely on a layman's understanding of such terms because "[a] notation of alert and oriented in medical terminology may be significantly different from what a layperson would understand it to mean."

¶ 23 Second, defendant argued his trial counsel was ineffective for failing to confront Shepard with a contradiction between his testimony at the suppression hearing and defendant's medical records. In particular, he asserted that Shepard testified the "decision to arrest" defendant was not made until after his second interaction with defendant on October 5, 2011, while the medical records show Shepard instructed hospital personnel on October 3, 2011, that defendant would be arrested upon his release. Defendant maintained the discrepancy was relevant to the issue of Shepard's credibility and "the totality of the circumstances alleged in creating a custodial interrogation." Finally, he argued he suffered prejudice as a result of his counsel's ineffective assistance.

¶ 24 Defendant attached various documents to his amended postconviction petition, including medical records from his September 26 to October 6, 2011, hospitalization and the affidavits of his trial counsel, Gordon, and himself. Defendant's medical records show he was given pain medications while hospitalized, including fentanyl, oxycodone, and Robaxin, but that he was consistently described as "alert and oriented." On October 1, 2011, defendant was noted as being on a "continuous fentanyl PCA" that allowed him to press a button for a dose of the medication every 10 minutes. That date, he was described as "alert and oriented X4" and having clear speech and the ability to follow commands. Defendant also verbalized an "understanding [of his] plan of care and [the] orders in place."

¶ 25 On October 2, 2011, defendant was described as alert and oriented and "following commands." Defendant reported pain and a continuous dose fentanyl PCA remained available to him. Records reflect defendant was "observed pushing button for pain control." On October 3, 2011, defendant was noted as "alert and oriented x4." Records reflect defendant "ambulated in unit today with [nonslip] socks on." Defendant reported pain with activity but denied "pain at rest." His PCA "settings" were decreased and "[o]ral pain [medication was] added." Additionally, a note was made that Shepard arrived at the hospital and talked with defendant and that "[patient] is to go to [j]ail upon discharge." Additional notes reflect that defendant's

girlfriend was "banned" from seeing defendant "due to inappropriate behavior" and that defendant inquired with medical staff about a crime victim's application form.

¶ 26 On October 4, 2011, defendant was described as "alert and oriented x 3." For pain, defendant was given oxycodone, which he could take every four hours. It was also noted that defendant had a "high potency fentanyl PCA in place as well." Records state that "PCA use" was explained to defendant and he verbalized his understanding. Defendant also made a request that a letter verifying his hospitalization be faxed to the circuit clerk's office because he had a court appearance the following day. On October 5, 2011, defendant was described as "oriented x4." He reported pain and was given oral pain medications of oxycodone and Robaxin. Defendant was also noted as being "[u]p to bathroom independently." On October 6, 2011, defendant was, again, described as "oriented x4."

¶ 27 As stated, attachments to defendant's amended postconviction petition also included the affidavits of his trial counsel, Anthony Ortega, Gordon, and himself. The record shows Ortega averred that he did not call any hospital personnel to testify during defendant's suppression hearing "because the medical records consistently indicated that [defendant] was oriented in all spheres" and he "did not think that calling hospital staff would be helpful." Gordon asserted that she was defendant's girlfriend in 2011 and, although she was not present during Shepard's interviews with defendant, she visited defendant in the hospital on both October 3 and 5, 2011. According to Gordon, defendant was "heavily medicated on both days," was groggy and "very sleepy," and could not carry on full conversations. Defendant averred that his testimony at the suppression hearing was true. He asserted he was in pain and on medication when interviewed by Shepard. Defendant maintained that he did not agree to speak with Shepard and did "not recall much." He also asserted he had been "sleepy and incoherent," and he did not feel free to leave the room. According to defendant, he "could not have gotten out of bed."

¶ 28 On August 19, 2015, the State filed a motion to dismiss defendant's amended petition, arguing it was "substantially insufficient at law." With respect to Ortega's alleged ineffectiveness at the suppression hearing, the State argued, in part, that the medical records appended to defendant's motion actually bolstered Shepard's testimony, "showing [d]efendant was oriented and able to manage his affairs at the time of the interviews." Further, it noted that defendant had failed to offer any affidavits or other documentation from a medical expert to show how the medication he was on affected him or to support his contention that the term " [']oriented['] should be taken at anything other than face value."

¶ 29 On November 12, 2015, a hearing was conducted before Judge Clem on defendant's amended postconviction petition and the State's motion to dismiss. Following the parties' arguments, Judge Clem partially granted and partially denied the State's motion. In particular, Judge Clem denied the motion with respect to defendant's claim of Ortega's ineffectiveness at the suppression hearing. On December 3, 2015, the State filed an answer to defendant's amended postconviction petition.

¶ 30 Thereafter, Judge Thomas J. Difanis began presiding over the case. On March 21, 2016, Judge Difanis conducted a hearing on the matter and informed the parties that he intended to "revisit the motion to dismiss." On April 13, 2016, the parties appeared before Judge Difanis and presented arguments relative to defendant's amended postconviction petition and the State's motion to dismiss. Following the parties' arguments Judge Difanis dismissed defendant's petition, stating as follows:

"Well, it's this court's opinion, based upon the [postconviction] petition that was filed, despite the fact that it's taken us down this road, that petition is insufficient. It's patently without merit. The issues have been addressed by the Appellate court. It's a *res judicata*, and I will order that the [postconviction] petition is dismissed."

¶ 31    This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant challenges the trial court's second-stage dismissal of his amended postconviction petition. Specifically, he argues Judge Difanis lacked authority to *sua sponte* revisit the State's motion to dismiss where the State elected to answer the defendant's petition rather than seek reconsideration of Judge Clem's partial denial of its motion to dismiss. Alternatively, defendant contends that Judge Difanis exceeded any authority he had to revisit the State's motion because (1) Judge Clem's previous ruling was not clearly erroneous and did not result in a manifest injustice and (2) Judge Difanis did not give careful consideration to Judge Clem's previous decision. Finally, defendant contends Judge Difanis erred in dismissing his amended postconviction petition at the second stage because his claim that his trial counsel provided ineffective assistance during the suppression hearing made a substantial showing of a constitutional violation.

¶ 34    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2012)) "provides a three-stage process for the adjudication of postconviction petitions." *People v. Harris*, 224 Ill. 2d 115, 125, 862 N.E.2d 960, 967 (2007). "At the first stage of postconviction proceedings, the circuit court reviews the petition and may summarily dismiss it if the court determines it is 'frivolous or is patently without merit.' " *People v. Perkins*, 229 Ill. 2d 34, 42, 890 N.E.2d 398, 402 (2007) (quoting 725 ILCS 5/122-2.1(a)(2) (West 2002)). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *Harris*, 224 Ill. 2d at 126.

¶ 35    Pursuant to section 122-2 of the Act (725 ILCS 5/122-2 (West 2012)), a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." "The failure to comply with section 122-2 is fatal and by itself justifies the petition's summary dismissal." *Harris*, 224 Ill. 2d at 126.

¶ 36    When a postconviction petition is not dismissed at the first stage, it advances to the second stage where counsel may be appointed and the State may file a responsive pleading. *Id.* "If at the second stage a substantial showing of a constitutional violation is established, the petition proceeds to the third stage for an evidentiary hearing." *Id.*

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767.

The second-stage dismissal of a postconviction petition is subject to *de novo* review. *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006).

¶ 37    As stated, defendant first argues that Judge Difanis lacked authority to dismiss his amended postconviction petition because the State filed an answer to the petition rather than a motion to reconsider the denial of its motion to dismiss. We disagree.

¶ 38    "A court has the inherent authority to reconsider and correct its rulings, and this power extends to interlocutory rulings as well as to final judgments." *Stevens v. Village of Oak Brook*, 2013 IL App (2d) 120456, ¶ 37, 990 N.E.2d 802 (citing *People v. Mink*, 141 Ill. 2d 163, 171, 565 N.E.2d 975 (1990)). "[I]t is of no consequence that the original order was entered by another circuit judge." *People v. DeJesus*, 127 Ill. 2d 486, 494, 537 N.E.2d 800, 804 (1989). Additionally, "a court is within its discretion to change its ruling and may even *sua sponte* reconsider a prior ruling." *National Union Fire Insurance Co. of Pittsburgh, PA v. DiMucci*, 2015 IL App (1st) 122725, ¶ 57, 34 N.E.3d 1023.

¶ 39    Defendant acknowledges a circuit court's authority to reconsider past rulings but maintains such authority is "wholly irrelevant" to his argument and circumstances. He contends that "[b]y filing an answer, the State foreclosed any reconsideration of the legal sufficiency of [his petition]." To support his contention, defendant primarily relies on the Third District's decision in *People v. Thompson*, 2016 IL App (3d) 140586, 70 N.E.3d 655. There, the trial court advanced a defendant's postconviction petition to the second stage of proceedings and appointed counsel, who filed an amended petition. *Id.* ¶ 20. The court directed the State to file a responsive pleading and the State elected to file an answer rather than a motion to dismiss. *Id.* The trial court ultimately dismissed the defendant's petition without conducting a third-stage evidentiary hearing, which the Third District held was reversible error. *Id.*

¶ 40    We find *Thompson* is distinguishable. Notably, unlike *Thompson*, the State in this case did file a motion to dismiss defendant's postconviction petition, arguing that he failed to make a substantial showing of a constitutional violation. The trial court ruled on that motion, partially granting and partially denying it, and the matter was scheduled for an evidentiary hearing. Before the hearing could be held, the court, on its own motion, elected to reconsider its previous ruling. Contrary to defendant's assertion, we find the trial court's inherent authority to reconsider its prior rulings is directly applicable to this case. Because the State moved to dismiss the petition and that motion was ruled upon, the court could reconsider that ruling and correct it. As indicated, that authority was inherent and not derived from or foreclosed by any State action or inaction. *Thompson* is inapplicable as it does not address the issue presented by the facts of this case.

¶ 41    Defendant alternatively argues that, even if Judge Difanis had authority to reconsider Judge Clem's original ruling on the State's motion to dismiss, Judge Difanis acted outside of his authority. He maintains that it is "generally improper for a *** judge to review a prior decision in the same case that has already been made by a predecessor *** judge" and there is only "a limited exception" for "when the predecessor judge's ruling was clearly erroneous and the successor judge carefully considered the prior decision before revisiting it." Defendant contends Judge Clem's ruling in the instant case was not clearly erroneous and that Judge Difanis failed to give it careful consideration. We disagree that reversible error occurred.

¶ 42    In *Balciunas v. Duff*, 94 Ill. 2d 176, 185, 446 N.E.2d 242, 246 (1983), the supreme court held that "an interlocutory order may be reviewed, modified[,] or vacated at any time before final judgment, and it is of no consequence that the original order was entered by another

circuit judge." See also *People v. Johnson*, 2017 IL 120310, ¶ 33, 77 N.E.3d 615 (finding a predecessor judge's ruling regarding the timeliness of a defendant's postconviction petition was an interlocutory order that a successor judge had the power to review and reconsider). Further, the court favorably cited its previous decision in *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 121, 382 N.E.2d 1217, 1220 (1978), wherein it held as follows:

> " 'While prior rulings should be vacated or amended only after careful consideration, especially if there is evidence of "judge shopping" on behalf of one who has obtained an adverse ruling, a court is not bound by an order of a previous judge [citation] and has the power to correct orders which it considers to be erroneous.' " *Balciunas*, 94 Ill. 2d at 186 (quoting *Towns*, 73 Ill. 2d at 121).

¶ 43    The supreme court went on to hold that "considerable restraint in reversing or modifying previous rulings" should be exercised in the context of prior discovery rulings, which involve the exercise of discretion by the trial court. *Id.* at 187-88. It elaborated as follows:

> "Accordingly, once the court has exercised its discretion, that ruling should not be reversed by another member of the court simply because there is disagreement on the manner in which that discretion was exercised. Rather, a successor judge, before whom the case has been assigned, should revise or modify previous discovery rulings only if there is a change of circumstances or additional facts which warrant such action. Such a rule minimizes the potential for 'judge shopping' and preserves the orderly and efficient functioning of the judicial system. We note, too, that our holding is in accord with the general rule in the Federal courts, which recognizes the power of a Federal district judge to revise or modify a ruling by another judge in the same case, but requires a compelling reason for such action." *Id.* at 188.

¶ 44    From this authority, it is clear that a successor judge has the power to correct orders which he or she considers to be erroneous, but the successor judge should exercise careful consideration, particularly when the case involves evidence of judge shopping. Additionally, more stringent rules apply in the context of rulings that involve the exercise of discretion.

¶ 45    Here, the record contains no evidence or allegations of judge shopping and Judge Clem's prior ruling was not one that involved the exercise of discretion. *People v. Coleman*, 183 Ill. 2d 366, 387, 701 N.E.2d 1063, 1074 (1998) ("The decision to dismiss a [postconviction] petition does not require a true exercise of discretion by the circuit court."). Further, although defendant maintains Judge Difanis failed to give Judge Clem's prior ruling careful consideration, we find that the record amply supports his ultimate determination that Judge Clem's partial denial of the State's motion to dismiss was erroneous. Additionally, we may affirm Judge Difanis's second-stage dismissal of defendant's petition on any basis supported by the record. *People v. Davis*, 382 Ill. App. 3d 701, 706, 889 N.E.2d 622, 628 (2008) (stating the trial court's dismissal of a postconviction petition may be affirmed "on any basis shown by the record, even if that basis was rejected by the trial court"). On appeal, defendant argues only that Judge Clem's partial denial of the State's motion to dismiss was correct because his petition made a substantial showing that his trial counsel was ineffective for failing to introduce medical records and medical testimony at the hearing on his motion to suppress. For the reasons that follow, we disagree and find defendant's petition was insufficient to make such a showing.

¶ 46    Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36. To prevail

on such a claim, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "[A] 'reasonable probability' is defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526. "When reviewing a ruling on a motion to suppress, overcoming the prejudice prong requires the defendant to show a reasonable probability *both* that: (1) the suppression motion would have been granted; *and* (2) the trial outcome would have been different if the evidence had been suppressed." (Emphases in original.) *Id.* In this instance, defendant's petition did not make a showing of either deficient performance or prejudice.

¶ 47    First, decisions as to which witnesses to call or what evidence to present are viewed as matters of trial strategy and "generally immune from claims of ineffective assistance of counsel." *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999). "The only exception to this [general] rule is when counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *Id.* at 432-33.

¶ 48    Here, Ortega's affidavit, attached to defendant's postconviction petition, establishes that he chose not to present medical records or testimony "because the medical records consistently indicated that [defendant] was oriented in all spheres" and he "did not think that calling hospital staff would be helpful." The medical records attached to defendant's petition show that, although defendant was on pain medication, he was continuously described as being alert and/or oriented. They also reflect that defendant effectively communicated with hospital staff regarding both medical and legal matters. Ultimately, the medical records support Shepard's testimony at the suppression hearing and the record does not reflect that Ortega's strategy was unsound.

¶ 49    Defendant argues that Ortega should not have relied on his laymen's interpretation of the medical records. Rather, he should have investigated further by interviewing medical personnel and presenting their testimony at the suppression hearing. However, we note defendant neglected to attach the affidavits of any medical personnel or other evidence to his petition that would support an alternate interpretation of those records. Again, the Act requires that a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012); see also *People v. Guest*, 166 Ill. 2d 381, 402, 655 N.E.2d 873, 883 (1995) ("To support a claim of failure to investigate and call witnesses, a defendant must introduce affidavits from those individuals who would have testified. Without affidavits, this court cannot determine whether these witnesses could have provided any information or testimony favorable to defendant."). As a result, we have only defendant's bare, unsupported assertion that the medication he was on adversely affected his ability to communicate and make decisions. The mere fact that defendant was medicated does not warrant a finding that his statements to Shepard were unknowing or involuntary, particularly where the medical records indicate otherwise.

¶ 50    Defendant also argues that Ortega should have introduced his medical records to attack Shepard's credibility. He notes that the records reflect Shepard notified the hospital of defendant's impending arrest on October 3, 2011, rather than on October 5, 2011, as Shepard testified at the suppression hearing. However, again, we can find no deficient performance.

While defendant accurately points out a discrepancy between Shepard's testimony and the medical records, the medical records otherwise support Shepard's testimony that defendant was coherent and had the ability to effectively and appropriately communicate. Additionally, we note that to the extent defendant argues such evidence would support the *Miranda* claim he presented at the suppression hearing, we must disagree because there is no allegation that defendant was made aware of Shepard's intent to arrest him. See *People v. Braggs*, 209 Ill. 2d 492, 506-07, 810 N.E.2d 472, 482 (2003) (stating "it is generally irrelevant that the interrogating officer subjectively viewed the individual under questioning as a suspect" unless the officer's beliefs are "conveyed by word or deed to the individual being questioned").

¶ 51 Second, defendant's allegations also fail to show prejudice. Initially, we find no reasonable probability that the result of the suppression hearing would have been different if defendant's medical records had been introduced. Those records show defendant was given pain medication while hospitalized but fail to indicate that the medication adversely impacted his ability to communicate or make decisions. Rather, as discussed, defendant's medical records support Shepard's testimony that defendant was coherent and aware of what was going on around him. Defendant's claim that medical testimony may have benefited his case was not properly pled, as he failed to attach any supporting affidavits or evidence to support such a claim to his petition. Additionally, we note the medical records also contradict defendant's testimony regarding his physical condition. At the suppression hearing, Shepard testified that defendant got out of bed and walked to the bathroom during their second interaction on October 5. Although defendant testified that was not true and he had been unable to get out of bed, defendant's medical records reflect he was, in fact, independently using the bathroom on that date. Thus, the medical evidence that was presented with defendant's petition was more harmful than helpful to his claims at the suppression hearing.

¶ 52 We also agree with the State's contention that, even if the motion to suppress had been granted, there is no reasonable probability that the outcome of defendant's trial would have been different. The State's evidence showed that two armed and masked intruders entered Seals's home and made demands. Green shot at the intruders who fled. Around the time of the home invasion, defendant's girlfriend and son found him lying in the yard of Seals's next-door neighbor near some bushes. Defendant had gunshot wounds and was taken to the hospital. When police searched the next-door neighbor's yard, they found a mask in the neighbor's bushes that contained a DNA profile that was consistent with defendant's DNA profile. Thus, the State presented substantial circumstantial evidence of defendant's guilt. Similar to defendant's statement to Shepard, which placed defendant at Seals's Eureka Street residence on the night of the offense, the State's evidence placed defendant in the next-door neighbor's yard, injured with gunshot wounds. Additionally, the State presented DNA evidence linking defendant to the offense. Accordingly, we find Judge Difanis correctly dismissed defendant's amended postconviction petition.

¶ 53                                III. CONCLUSION

¶ 54 For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State $75 as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2016).

¶ 55 Affirmed.