NOTICE
Decision filed 04/14/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 210085

NO. 5-21-0085

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 10-CF-356 |
| | ) | |
| DARIUS A. JENKINS, | ) | Honorable |
| | ) | Christopher E. Hitzemann, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Cates and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Darius A. Jenkins, appeals the order of the circuit court of St. Clair County that granted the State's motion to reconsider an earlier ruling, entered by a different judge of the circuit court, that granted the defendant a new trial following a full evidentiary hearing that was held subsequently to a preliminary *Krankel* inquiry[1] that was ordered by this court. See *People v. Krankel*, 102 Ill. 2d 181 (1984). For the following reasons, we reverse the order granting the State's motion to reconsider, and we remand for a new trial.

_____

[1]A preliminary *Krankel* inquiry is required when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel. See, *e.g.*, *People v. Jackson*, 2020 IL 124112, ¶ 96. If the circuit court concludes, following the preliminary inquiry, that the defendant's *pro se* "allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at further proceedings on the claims, which may include a full evidentiary hearing. *Id.* ¶ 97.

1

¶ 2                                    I. BACKGROUND

¶ 3      For purposes of brevity and judicial economy, we discuss only the facts necessary to our disposition of this appeal. The defendant was convicted, following a December 2011 jury trial, of first degree murder for his role in the shooting death of Dominic Brown and subsequently was sentenced to a term of imprisonment of 45 years. See *People v. Jenkins*, 2014 IL App (5th) 120177-U, ¶¶ 4-13. The defendant filed a direct appeal, and thereafter this court remanded to the circuit court of St. Clair County for, *inter alia*, a proper preliminary *Krankel* inquiry into the defendant's *pro se* posttrial claims of ineffective assistance of trial counsel. *Id.* ¶¶ 22-24. Following remand, the defendant again appealed, arguing that the State improperly was allowed to participate in the preliminary *Krankel* inquiry held on remand. See *People v. Jenkins*, No. 5-15-0343, ¶ 4 (2017) (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court agreed, noting that "while conducting a preliminary *Krankel* inquiry, the circuit court elicited the State's input, and the State took an adversarial position, arguing that [the defendant's] claims were without merit." *Id.* ¶ 5. Accordingly, we "remand[ed] the cause to the circuit court for a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation." *Id.*

¶ 4      On remand, the case was assigned to a different judge, the Honorable Stephen P. McGlynn. On April 4, 2018, Judge McGlynn held a preliminary inquiry hearing in which he asked the defendant to describe to him, in the defendant's own words, the defendant's contentions of ineffective assistance of trial counsel. The defendant read a prepared note to Judge McGlynn, in which the defendant asserted each of his claims in extensive detail, including his claim that witness Arthur Reed gave perjured testimony at the defendant's trial. The ineffective assistance of counsel claim related to counsel's "failure to impeach and/or investigate" Reed's testimony, particularly because "[c]ounsel was aware that Reed was a snitch, willing to lie in order to get favors from the State." The defendant argued that "[c]ounsel knew that Reed had signed an affidavit claiming that

2

he had lied as a snitch in the past for a sentence reduction in other cases," and that "[c]ounsel could have used this affidavit to impeach Reed in order to show that Reed was willing to lie in exchange for a better deal, but counsel did not." The defendant noted that he had a newer affidavit from Reed in which Reed admitted that he lied at the defendant's trial about seeing the defendant on the night of the murder. The defendant claimed that, in the affidavit, Reed stated that when Reed was being held "in segregation in Lawrence," St. Clair County Assistant State's Attorney Joe Christ approached Reed about the defendant's case, which Reed knew about "based on rumors he had heard around town." The defendant contended that "[i]n exchange for testimony that Reed saw me leave the scene of the crime that night, Christ promised to keep Reed in the St. Clair County jail as long as he could so that [Reed] could visit with his family."

¶ 5    When the defendant finished, Judge McGlynn stated as follows:

"That was well done. You certainly met the burden of establishing that there's enough questions about what happened at this trial to proceed to the next stage. I certainly am concerned any time there's an allegation of perjured testimony, [and] you have a supporting affidavit saying that the supposed eyewitness is now saying he was not there and that he lied *** after talking to prosecutors about your case in his own. So, at this stage I will appoint counsel to represent you to *** help you pull this together."

¶ 6    Judge McGlynn then described in detail the exhibits that were presented to him by the defendant at the hearing, including Reed's 2013 affidavit. Throughout the hearing, Judge McGlynn described the proceedings as being "post-conviction" and, when returning the exhibits to the defendant, told the defendant that the defendant could share them with his new counsel "in preparation of going forward on your post-conviction petition."

¶ 7    On March 25, 2019, Judge McGlynn held a status hearing in the case. He again referred to the proceedings as being "post-conviction proceedings" and stated that he expected "the next

3

meaningful hearing to be a hearing where *** we hear the testimony of multiple witnesses." He thereafter repeatedly referred to the hearing that was to follow as an "evidentiary hearing."

¶ 8       On May 29, 2019, the evidentiary hearing took place. Judge McGlynn stated at the outset of the hearing that amended *Krankel* claims had been filed. Thereafter, he again referred to the proceedings before him as "these post-conviction proceedings." Defense counsel subsequently stated that he wished to clarify that "this technically is not a post-conviction petition. This is *** simply on the *Krankel* assertions." Judge McGlynn thereafter stated, "this is an evidentiary hearing on the criticisms that at the time of the initial trial the defendant did not have adequate assistance of counsel; that, in fact, the counsel was ineffective so much so that he should be entitled to a new trial." Counsel for the State, and the defendant's counsel, agreed with Judge McGlynn, with counsel for the State specifically stating, "We are essentially in an extended post-trial motion," to which Judge McGlynn responded, "That's the way I look at it." Judge McGlynn thereafter allowed the defense to begin calling its witnesses.

¶ 9       Extensive testimony was adduced from the witnesses at the evidentiary hearing. Of significance to the issue we find dispositive of this appeal, the defendant testified that at the time of the murder, he did not know Arthur Reed and would not have recognized Reed. When asked how many conversations he had had with Reed, the defendant testified, "None." He testified that he knew "a couple" of Reed's cousins or family members. He testified that he did not know that Reed was a potential witness against him until the day his trial was scheduled to start. He testified that he later learned from another inmate at the county jail that Reed "would just jump on other people's cases as a witness against them" and that the inmate gave the defendant a copy of an affidavit Reed had executed in which Reed acknowledged that he would offer testimony in other people's cases in exchange for better deals in his own cases. The defendant testified that he gave the affidavit to his trial counsel. The affidavit was admitted into evidence at the hearing. The

4

defendant testified that after his trial, he learned that Reed was "buddies" with the wife of Dominic Brown, the murder victim in this case, and that Reed and Brown's wife "were drug addicts" who "ran around and got high together."

¶ 10　Arthur Reed testified that he was presently serving a 15-year sentence in the Illinois Department of Corrections at Pinckneyville Correctional Center. He testified that he had testified against the defendant at the defendant's trial because he "was forced to do that." He testified that he had "testified to what they told [him] to say," which was that he saw the defendant with a gun on two previous occasions and that, on the night of the murder of Brown, Reed saw the defendant "running from the scene of which the victim was killed." He testified that he did not see the defendant do those things, that he "was nowhere in that neighborhood," and that in fact he was in St. Louis, Missouri, at the time of the murder. He testified that Assistant State's Attorney Joe Christ contacted him while he was imprisoned at Lawrenceville Correctional Center and, thereafter, had him brought to St. Clair County, where Christ and a woman Reed did not identify by name told Reed "what they wanted [him] to say" at the defendant's trial, and "threatened also that they [were] going to charge [him] with a burglary to an old building."

¶ 11　Reed testified that prior to that, he had never met Christ or the woman, who Reed said was also introduced to him as an assistant state's attorney. He testified that he believed that Christ contacted him because of Reed's friendship with Brown's wife. He testified that he recognized the aforementioned affidavit that had been admitted into evidence at the hearing, that he signed it, and that it was true. He agreed that the case mentioned in that affidavit involved someone named Suntez Pasley and that, in the affidavit, Reed recanted the testimony he had given in Pasley's case. He agreed that, in the affidavit, he stated that he had lied in Pasley's case to get a better deal in his own case. Reed testified that after he testified against the defendant, "Joe Christ came out and said Michael Cook told him that I needed an award for that show that I put on in there." He testified

5

that he was allowed to stay in the St. Clair County jail for an additional five days, during which he hoped to visit with relatives, although ultimately they did not come to visit him. Reed apologized to the defendant for lying at his trial, then added: "I know you didn't deserve that, but that was just me at the time. I was on drugs and didn't care, so it is what it is."

¶ 12 On cross-examination, with regard to his affidavit recanting his testimony against the defendant in this case, Reed testified that the affidavit was true and that he stood by it. He agreed that the affidavit did not mention being threatened with a burglary charge, but instead mentioned only that he was allowed to spend additional time in the St. Clair County jail in return for his testimony. He agreed that when he met with the defendant's attorneys prior to the trial, he did not tell them that he was being coerced into testifying against their client, or that he had been told by the State what to say at the trial, but testified that he did not reveal this information to the attorneys because he was concerned about being charged with the aforementioned burglary. When questioned about discrepancies in his trial testimony, Reed testified, repeatedly, that he testified the way the State asked him to testify. Thereafter, Judge McGlynn briefly questioned Reed as well.

¶ 13 Following Reed's testimony, the State called its two witnesses, who were the defendant's counsel at his trial. Both counsel testified that, at the time they represented the defendant at his 2011 first degree murder trial, they were recently-licensed attorneys and had not previously tried any murder cases before a jury. One of his counsel testified that the defendant's trial was that counsel's first felony trial. He further testified that, just prior to trial, as the parties were preparing to select a jury, the defense was notified by Assistant State's Attorneys Joe Christ and Debbie Phillips—who were handling the case for the State—that the State "had come up with a *** new witness." Counsel testified that the defense requested a continuance, then interviewed the new witness, who was Arthur Reed. Counsel also testified in extensive detail about other aspects of the representation of the defendant at trial. Judge McGlynn briefly questioned both counsel as well.

6

Following the presentation of testimony, the hearing was recessed so that additional filings could be made by the parties, if desired, and so that argument could be presented by the parties at a subsequent hearing. On December 11, 2019, the subsequent hearing was held, and the parties presented their arguments. Thereafter, Judge McGlynn took the matter under advisement.

¶ 14   On September 16, 2020, Judge McGlynn filed his seven-page, handwritten order on the merits of this case. Therein, Judge McGlynn granted the defendant's motion for a new trial. As his first basis for granting the motion, Judge McGlynn found that "[t]he State procured perjured testimony from *** Reed," and that "[t]he false testimony was on material issues." He thereafter found that "Reed admitted he offered false testimony as part of a deal, favorable to him, reached with prosecutors." Judge McGlynn then ruled that the defendant also was "entitled to a new trial due to ineffective assistance of counsel." He discussed in detail some of his reasoning for this ruling as well, then added that "[o]ther errors by defense counsel also contributed to the overall ineffectiveness of counsel to present a suitable defense for the defendant." He ruled that "[c]ounsel's representation fell below an objective standard of reasonableness, and the substandard representation prejudiced the defendant." He thereafter ruled that "[b]ecause of the perjured testimony procured by the State, and the ineffective assistance of counsel, I can have no confidence in this verdict."

¶ 15   On October 6, 2020, the State filed a motion to reconsider Judge McGlynn's order. Although the State argued that, *inter alia*, Judge McGlynn abused his discretion by granting the defendant a new trial on the basis of Reed's purportedly perjured testimony, the State did not argue that, as a legal matter, the circuit court could not, pursuant to an evidentiary hearing held after a preliminary *Krankel* inquiry, reach the merits of a claim only indirectly related to ineffective assistance of trial counsel. Because Judge McGlynn had by this point left the circuit court to serve as a federal district court judge, the case was assigned to a new judge. First, the Honorable John

O'Gara recused himself when it was assigned to him because of his involvement in the case while acting as a public defender. The case then was assigned to the Honorable Zina Cruse. The State filed a motion to substitute Judge Cruse, arguing that she was "so prejudiced against them that they [could not] receive a fair trial." The motion was granted, and the case was assigned to the Honorable William D. Stiehl, who also recused himself due to a conflict directly related to the case. The case was then assigned to the Honorable Christopher E. Hitzemann.

¶ 16    On January 11, 2021, the defendant filed a response to the State's motion to reconsider Judge McGlynn's order granting the defendant a new trial. Therein, defense counsel noted, *inter alia*, that Judge McGlynn had found that the State engaged in "misconduct" and further had "made a factual finding that Reed's testimony constituted perjury, and that it was procured by way of offering Reed a deal with the State." Defense counsel pointed out that the State took issue with Judge McGlynn's factual findings as to this issue—not with his legal analysis or the legal bases for his ruling—and that those factual findings were entitled to "great deference" on review. Defense counsel meant that factual findings should not be reversed absent clear error because Judge McGlynn "heard hours of testimony, where he was able to observe the witness demeanor and judge [their] credibility." Counsel posited that Judge McGlynn's findings of fact were not clear error because "more than sufficient evidence was presented to support them."

¶ 17    On March 11, 2021, Judge Hitzemann held a hearing on the State's motion to reconsider. At the hearing, the State argued that Judge McGlynn erred both as a matter of fact and as a matter of law. With regard to the former, the State argued that, *inter alia*, Judge McGlynn should not have believed Reed's May 29, 2019, testimony, and pointed out what the State considered to be inconsistencies in that testimony. With regard to the latter, the State argued that, *inter alia*, Judge McGlynn erred in finding a new trial was required by the purported ineffective assistance of counsel because, according to the State, the evidence in this case was not closely balanced and,

8

accordingly, the defendant could not demonstrate prejudice, regardless of his trial counsel's allegedly deficient performance.

¶ 18    In response to a question posed by Judge Hitzemann about his standard of review of Judge McGlynn's decision, defense counsel argued that, based upon his observation of Judge McGlynn throughout the proceedings, he believed that Judge McGlynn "displayed a very comprehensive knowledge of the case and of all the testimony and all the things that have gone before." Defense counsel argued that, accordingly, Judge Hitzemann had a "duty" to give some deference to Judge McGlynn's factual findings and further argued that had Judge McGlynn not left the state bench for service on the federal bench, it would have been Judge McGlynn hearing the motion to reconsider. Counsel opined that, in light of his observation of Judge McGlynn during this case, counsel would be "awfully shocked" if Judge McGlynn were to reverse positions and grant the State's motion to reconsider. Defense counsel also argued extensively that Judge McGlynn did not err as a matter of fact or as a matter of law. Defense co-counsel reiterated the care taken by Judge McGlynn in the prior proceedings and argued that Judge McGlynn's findings were entitled to deference and that the State should not be allowed to "attempt to relitigate the entire thing" after Judge McGlynn's departure from the state bench. No witnesses provided testimony at the hearing, and at the conclusion of the hearing, Judge Hitzemann took the matter under advisement.

¶ 19    On March 19, 2021, Judge Hitzemann held a hearing at which the parties appeared, and at which he pronounced his ruling from the bench. On that same date, he filed his written order. At the hearing, Judge Hitzemann stated that the defendant was "currently on direct appeal and the appellate court instructed us here to conduct a proper *Krankel* hearing." With regard to Judge McGlynn's finding that the defendant was entitled to a new trial because the State procured perjured testimony at the defendant's trial, Judge Hitzemann stated as follows: "I don't see that as an issue that is properly here before the court at this stage and I don't find it as a proper reason to

9

issue a new trial here." He then discussed in detail his reasons for finding that the defendant was not entitled to a new trial on the basis of alleged ineffective assistance of counsel. Judge Hitzemann's written order was consistent with his oral pronouncement. This timely appeal followed. Additional facts will be presented as necessary throughout the remainder of this opinion.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, the defendant contends that Judge Hitzemann erred in granting the State's motion to reconsider Judge McGlynn's order granting the defendant a new trial because, according to the defendant, Judge McGlynn was correct that (1) the defendant received ineffective assistance of trial counsel and was prejudiced thereby and (2) the State's procurement of perjured testimony from Reed also merited a new trial. Because this case, at this stage, is a continuation of the defendant's direct appeal process, the defendant raises additional arguments related to the conduct of his trial, unrelated to the *Krankel* proceedings discussed above. Because of the unique procedural posture of this case—and because we find it necessary to our disposition of this appeal—we begin our analysis with a brief exposition of precedent related to motions to reconsider, including with regard to successor judges.

¶ 22    It is well established that "[t]he purpose of a motion to reconsider is to bring to the court's attention a change in the law, an error in the court's previous application of existing law, or newly discovered evidence that was not available at the time of the hearing." *People v. $280,020 United States Currency*, 372 Ill. App. 3d 785, 791 (2007). The circuit court's power to reconsider its earlier rulings encompasses both interlocutory and final judgments. See, *e.g.*, *People v. Arze*, 2016 IL App (1st) 131959, ¶ 85. A circuit court order granting a new trial is interlocutory, and the circuit court has the authority to reconsider the order. *Id.* Moreover, in a criminal case, the circuit court possesses the inherent power to reconsider and correct its own rulings, even when there is no rule or statute that grants it that authority. *Id.* This is true even if the ruling under reconsideration was

10

entered by a different judge of the circuit court. See, *e.g.*, *People v. Brown*, 2018 IL App (4th) 160288, ¶ 38. That said, although a successor judge clearly has the power to correct orders that the successor judge finds to be erroneous, a successor judge must "exercise careful consideration"— or, put another way, must exercise " 'considerable restraint in reversing or modifying previous rulings' "—when the previous rulings of the other judge involve discovery rulings or other matters that involve the exercise of the previous judge's sound discretion. *Id.* ¶¶ 42-44 (quoting *Balciunas v. Duff*, 94 Ill. 2d 176, 187-88 (1983)). In general, the ruling of the circuit court on a motion to reconsider will be reviewed by this court for an abuse of discretion. See, *e.g.*, *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 20. If, however, the motion to reconsider asks the circuit court only to reevaluate its application of the law to the case as it existed at the time of the judgment, we review the ruling *de novo*. *Id.* We note as well that it is axiomatic that the circuit court abuses its discretion when its ruling rests on an error of law because it is always an abuse of discretion to base a ruling on an incorrect view of the law. See, *e.g.*, *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 10. In this case, the State's motion to reconsider did not ask the circuit court only to reevaluate its application of the law to the case as it existed at the time of the judgment; the State's motion contended that Judge McGlynn erred not only in his legal rulings, but in his factual ones as well. Accordingly, we apply an abuse of discretion standard to Judge Hitzemann's ruling on the State's motion to reconsider. We note that, for the reasons that follow, we would reach the same result if we applied *de novo* review.

¶ 23    In this case, as described above, one of the reasons Judge Hitzemann granted the State's motion to reconsider was Judge Hitzemann's conclusion that because this case was before the circuit court "to conduct a proper *Krankel* hearing," Judge McGlynn's finding that the defendant was entitled to a new trial because the State procured perjured testimony at the defendant's trial was not "an issue that [was] properly here before the court at this stage" and that, accordingly, it

11

was not "a proper reason to issue a new trial here." For the reasons explained below, we conclude that Judge Hitzemann's ruling on this question rests on an error of law, and therefore constituted an abuse of discretion by Judge Hitzemann.

¶ 24     The State, in asking this court to affirm Judge Hitzemann's ruling on this question, first argues that "[g]laringly missing from [the defendant's *Krankel*-related motions] is any allegation of prosecutorial misconduct as a basis to grant a new trial." The State insinuates that because this issue was not mentioned in the motions, it could not be considered and acted upon by Judge McGlynn, but cites no authority in support of that proposition. Instead, the State attacks the defendant's argument, which is that because this case was properly before Judge McGlynn on a posttrial motion—the amended *Krankel* claims filed by counsel appointed to represent the defendant—Judge McGlynn had the authority and the ability to order a new trial on the basis of misconduct by the State in procuring perjured testimony from Reed at the defendant's trial. The State notes that, in support of this argument, the defendant cites section 116-1(a) of the Code of Criminal Procedure of 1963 (Code), which states that "[f]ollowing a verdict or finding of guilty the court may grant the defendant a new trial." 725 ILCS 5/116-1(a) (West 2020). However, the State argues that the defendant is incorrect about the application of this section to this case because the Code "requires that the motion for new trial be filed within 30 days of the entry of a verdict and must specify the grounds therein," and in this case, the *Krankel*-related motions were not filed within 30 days of the defendant's conviction, and those motions were not related to claims of prosecutorial misconduct.

¶ 25     The State further asserts that it does "not take lightly allegations of prosecutorial misconduct or perjured testimony." Again without citation to supporting authority, the State posits that a "*Krankel* proceeding *** is not the proper mechanism in which to raise those allegations" and contends that the defendant "may raise his claim that the [State] procured perjured testimony

12

in a postconviction proceeding at which point it may be fully litigated" because the State "would then be on notice of [the] defendant's claim and could fully address the allegation." The State further posits that "[t]he question before this Court is if Judge Hitzemann erred when he found the claim was not a proper basis to grant a new trial pursuant to *Krankel* and a claim of ineffective assistance of counsel." The State notes precedent that allows a defendant to raise a claim of perjured testimony in a postconviction petition and concludes that, accordingly, the defendant "has at least one avenue to fully litigate his claim of prosecutorial misconduct that remains open." Without citation to authority, the State then posits that "[a]s to the issue at hand, Judge Hitzemann correctly found that prosecutorial conduct was not a proper basis to grant defendant a new trial where the claims raised were solely based on the ineffective assistance of his trial counsel."

¶ 26     In our view, the State's arguments miss the mark. In this case, there is no allegation—and nothing in the record to support such an allegation, even if one were made—that Judge McGlynn actively sought out evidence unrelated to the defendant's *Krankel*-related claims, conducted some sort of impermissible fishing expedition, or otherwise attempted to use *Krankel* proceedings for an improper purpose. To the contrary, one of the defendant's *Krankel*-related claims pertained to the manner in which the defendant's trial counsel handled trial witness Arthur Reed, and it was for that purpose that Reed was called as a witness at the evidentiary hearing on the defendant's *Krankel*-related claims. During Reed's testimony, Reed reiterated the allegations in his affidavit that he was approached by Christ about this case, was told to testify in an untruthful manner, was rewarded for his perjured testimony by being allowed to stay longer in the St. Clair County jail (rather than returning to the Illinois Department of Corrections facility where he previously had been held in segregation), and was threatened with prosecution for a burglary if he did not testify as the State wanted him to testify.

13

¶ 27      We note that Judge McGlynn was in a better position than Judge Hitzemann—and in a better position than this court—to observe Reed's demeanor, resolve conflicts in his testimony, and weigh his credibility. See, *e.g.*, *People v. Gonzalez*, 184 Ill. 2d 402, 412 (1998) (deferential review of factual findings "is grounded in the reality that" the judge who observed the testimony is in the best position to observe the witness's demeanor, resolve conflicts in testimony, and determine and weigh witness credibility). We further note that it is clear from Judge McGlynn's order that he believed Reed's testimony to be truthful, because the first basis for granting the defendant a new trial that is listed in Judge McGlynn's order is that "[t]he State procured perjured testimony from *** Reed," and that "[t]he false testimony was on material issues." He thereafter found that "Reed admitted he offered false testimony as part of a deal, favorable to him, reached with prosecutors." Moreover, later in his order, Judge McGlynn specifically stated that "[b]ecause of the perjured testimony procured by the State, and the ineffective assistance of counsel, I can have no confidence in this verdict."

¶ 28      Thus, in light of the manner in which this issue came to Judge McGlynn's attention, and in light of Judge McGlynn's findings of fact related to the evidence he heard about this issue, the narrow question that must be answered is whether the circuit court is required to ignore evidence, discovered during the course of a properly-held *Krankel* evidentiary hearing, of a serious non-*Krankel*-related error that occurred at trial, such as the procurement by the State of perjured testimony. We are aware of no precedent, and no compelling public policy considerations, that would require the circuit court to ignore such evidence. The State has cited no such precedent or policy reasons, either. Moreover, Judge Hitzemann cited no authority for his conclusion that Judge McGlynn could not consider the issue of the procurement of perjured testimony. Instead, he concluded, without further explanation, that because this case was before the circuit court "to conduct a proper *Krankel* hearing," Judge McGlynn's finding that the defendant was entitled to a

14

new trial because the State procured perjured testimony at the defendant's trial was not "an issue that's properly here before the court at this stage" and that, accordingly, it was not "a proper reason to issue a new trial here."

¶ 29    We note as well that, in this appeal, the State has not argued that Judge McGlynn, acting as a judge of the circuit court, lacked jurisdiction to consider such a claim and has not argued that the claim was somehow waived or forfeited by the defendant. With regard to what the State does argue, we agree with the defendant's assertion, in his reply brief, that "a *Krankel* inquiry and subsequent evidentiary hearing are extensions of a post-trial motion for new trial." Indeed, at the May 29, 2019, evidentiary hearing before Judge McGlynn, counsel for the State conceded as much. As explained above, at the outset of that hearing, after Judge McGlynn referred to the proceedings before him as "these post-conviction proceedings," defense counsel stated that he wished to clarify that "this technically is not a post-conviction petition. This is *** simply on the *Krankel* assertions." Judge McGlynn thereafter stated, "[T]his is an evidentiary hearing on the criticisms that at the time of the initial trial the defendant did not have adequate assistance of counsel; that, in fact, the counsel was ineffective so much so that he should be entitled to a new trial." Counsel for the State, and the defendant's counsel, agreed with Judge McGlynn, with counsel for the State specifically stating, "We are essentially in an extended post-trial motion." Judge McGlynn responded, "That's the way I look at it."

¶ 30    We also agree with the defendant's assertion, again in his reply brief, that the defendant "first brought up his *Krankel* claim in court on the same day that the motion for new trial was litigated," which place the claims raised at the subsequent hearing on the defendant's *Krankel*-related motions squarely under section 116-1(a) of the Code. Accordingly, we do not find convincing the State's contention that section 116-1(a) somehow precluded Judge McGlynn from considering this claim. With regard to the State's assertion that the defendant "may raise his claim

15

that the [State] procured perjured testimony in a postconviction proceeding at which point it may be fully litigated," we note that even if we were to assume, *arguendo*, that nothing *prevents* the defendant from waiting and bringing this claim in a postconviction petition, we nevertheless are aware of nothing that *requires* the defendant to wait to bring this claim, and the State cites no authority in support of such a requirement.

¶ 31    For all of these reasons, we conclude that Judge Hitzemann erred when he ruled that Judge McGlynn did not have the authority, following the evidentiary hearing, to consider the issue of the procurement of perjured testimony from Reed at the defendant's trial. As explained above, Judge Hitzemann's ruling rests on an error of law. Also as explained above, it is always an abuse of discretion to base a ruling on an incorrect view of the law. See, *e.g.*, *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 10. We would reach this same conclusion if we applied *de novo* review to Judge Hitzemann's ruling. We conclude that Judge Hitzemann further erred when he used his errant ruling on this point as one of his bases for granting the State's motion to reconsider Judge McGlynn's order granting the defendant a new trial. Judge Hitzemann's ruling on the State's motion to reconsider cannot stand without a valid basis for reversing Judge McGlynn's ruling that the defendant was entitled to a new trial on the basis of the State's procurement of perjured testimony from Reed at the defendant's trial. Thus, we conclude that we must reverse Judge Hitzemann's order granting the State's motion to reconsider.

¶ 32                              III. CONCLUSION

¶ 33    For the foregoing reasons, we reverse Judge Hitzemann's order granting the State's motion to reconsider, and we remand for the new trial that Judge McGlynn ordered.

¶ 34    Reversed and remanded.

*People v. Jenkins*, 2023 IL App (5th) 210085

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 10-CF-356; the Hon. Christopher E. Hitzemann, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | James Gomric, State's Attorney, of Belleville (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |